725 A.2d 1037

**In re ADOPTION NO. 12612 IN the CIRCUIT COURT FOR MONTGOMERY COUNTY, Maryland.**

**No. 83, Sept. Term, 1998.**

Court of Appeals of Maryland.

Feb. 17, 1999.

Reconsideration Denied April 9, 1999.

---

210

Jeffrey F. Liss (Shale D. Stiller, Donna Lee Yesner, Piper & Marbury, L.L.P), Julie S. Dietrich (O'Toole, Rothwell, Nassau & Steinbach; Evan S. Stolove, D. Jacques Smith, Arent, Fox, Kintner, Plotkin & Kahn, P.L.L.C., all on brief), Washington, DC, for Petitioner.

Jennifer Evans (Ralph E. Hall, Jr., on brief), Rockville, for Respondent.

Roger L. Conner, Washington, DC, for Amicus Curiae Center for the Community Interest.

Michael P. Bentzen, Davis & Bentzen, P.L.L.C., Washington, DC, for Amicus Curiae National Council on Adoption.

Andrew N. Vollmer, Reginald J. Brown, Christine Sarudy Roberts, Lyle Roberts, Wilner, Cutler & Pickering, Washington, DC, for Amici Curiae Supporting Petitioners.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, RAKER, WILNER and CATHELL, JJ.

WILNER, Judge.

This contested custody dispute, between the birth mother of a young child and the woman who has been the child's principal caregiver for most of his life, involves the construction of Maryland Code, § 9–101 of the Family Law Article. Ultimately at issue is whether the Circuit Court for Montgomery County erred in awarding custody of the child to his birth mother, notwithstanding (1) that she had murdered another of her children six years earlier, (2) while on probation for that crime, she engaged in a scheme of credit card fraud, leading to her conviction of mail fraud, and (3) other circumstances relating to her conspicuous lack of success in raising children. In an unreported opinion, the Court of Special Appeals, stressing the deference to be accorded to a trial judge's conclusion, affirmed that judgment. Because we conclude that the circuit court erred in failing to comply with § 9–101, as we construe it, we shall direct that the judgment of that court be vacated and the case remanded for further proceedings.

### BACKGROUND

The child whose custody is at issue is Cornilous Pixley, who is now three years old. The contestants here are Latrena Pixley, his birth mother, and Laura Blankman, his principal caregiver since Cornilous was three-and-a-half months old.

Ms. Pixley was born in June, 1973. Her upbringing was neither stable nor happy. She informed the court's adoption investigator in this case that her mother is an active alcoholic and drug abuser and has been incarcerated at least four times. Her father, also a drug abuser who apparently has never been gainfully employed, has been incarcerated on a number of

occasions, and her brother, who had previous incarcerations for drug distribution, was serving time for assault and violation of probation. Her father left when Ms. Pixley was but three or four years old. The family moved often, and Ms. Pixley went to at least six schools before dropping out at the end of the eleventh grade. At 14, she attempted to commit suicide by swallowing Tylenol pills. At 15, she was pregnant. By the time she was 23, she had four children by four different men, none of whom she either married or lived with for very long.

Ms. Pixley's first child, Carlos, was born in June, 1989, when Ms. Pixley was 16. Carlos remained with her for about a year, until she relinquished physical custody of the child to his paternal grandparents. She did that, she said, because she was pregnant with her second child and her mother, who had applied for social service benefits for Carlos, was using all of the money to buy drugs. The second child, Edward, was born in July, 1990; Ms. Pixley had just turned 17. In May, 1992, Ms. Pixley was living in the District of Columbia with a drug user named Terrell Cooper, although she was carrying the child of one Keith Scott. She had terminated her relationship with Mr. Scott because Scott did not want Edward in his apartment. On May 6, 1992, her daughter, Nakya, was born. Ms. Pixley did not want the child and allowed Mr. Scott to take her from the hospital.

When Nakya was five weeks old, Ms. Pixley agreed to watch her for a few days, while Mr. Scott was in New York. Along with the child, Scott brought a few cans of milk and some diapers. When he did not return in a week, Ms. Pixley called, and Scott said that he would come for the child, but he never did. Ms. Pixley ran out of formula and diapers, although she had other food in the apartment. On June 19, 1992—the day after Ms. Pixley called Scott—Nakya woke up crying. Ms. Pixley tried giving the child some water, to no avail. Her telephone had been disconnected. She went to a neighbor's apartment to use the telephone, but the neighbor was not then at home. Although Ms. Pixley had previously received assistance from Maryland social service agencies with

respect to Carlos and Edward, she made no attempt to contact any District of Columbia social service agency or to seek assistance from any other neighbor, and she had said nothing to her boyfriend before he left for work earlier that morning.[1] In short, other than seeking out one neighbor, she did nothing to obtain assistance for Nakya. Instead, she placed the child in her crib and smothered her with a blanket, keeping the blanket over Nakya's head for about a half hour. Edward was in the apartment at the time; there is some dispute whether he witnessed the murder of his infant sister. Eventually, Ms. Pixley stuffed the dead child in a trash bag, put her into a dumpster, and returned to the apartment to await the arrival of her boyfriend. When her boyfriend returned, she made dinner for him, for Edward, and for herself, and then the three of them visited the boyfriend's sister until two o'clock in the morning. Not until the next day did she inform her boyfriend of what she had done. After discovering the body in the dumpster, the boyfriend called his uncle, who called the police. Ms. Pixley was arrested. When asked by the police why she had killed Nakya, she said "I don't know."

It is at this point that the lives of Ms. Pixley and Ms. Blankman first converge. Ms. Blankman, at the time, was a 22–year–old college student who, while on a summer break, was doing an internship at the Washington, D.C. public defender's office. She worked with Lisa Greenman, Ms. Pixley's attorney in the murder case. In the course of assisting Ms. Greenman, Ms. Blankman got to know Ms. Pixley, and a friendship developed between them. Ms. Blankman completed her internship in July or August and returned to school, but she and Ms. Pixley continued to correspond by mail. Although she may have attended a hearing of some kind involving Ms. Pixley during another break, her next recollection of meeting Ms. Pixley was in the fall of 1995, when, by

---

1. Ms. Pixley offered several explanations for not seeking help from a social service agency. At her deposition, she said that she sought no assistance because she planned to place the baby for adoption. She told the adoption investigator in this case that she was unfamiliar with the social service system in Washington, D.C.

happenstance, she encountered her in Washington while crossing the street.

Ms. Pixley was on the street due to the outcome of the criminal case. In June, 1993—a year after the murder—Ms. Pixley pled guilty to second degree murder. The full record of that proceeding in the Superior Court of the District of Columbia is not in the record before us, but it appears that, at sentencing, Judge Mitchell was persuaded by a psychiatric assessment that Ms. Pixley was suffering from postpartum depression when she murdered Nakya. That assessment was accepted by the circuit court in this case.[2] Judge Mitchell sentenced Ms. Pixley to prison for a period of from five to fifteen years but then suspended execution of that sentence in favor of her serving weekends at a halfway house for three years and five years of probation. Because of her obligation to spend weekends at the halfway house, Ms. Pixley signed a stipulation that she was unable to care for Edward, who was placed in foster care. Ms. Pixley visited with Edward frequently in the beginning. The visits were suspended for a time due to Edward having nightmares, but were reinstated until eventually terminated by the District of Columbia court. Ms. Pixley had not seen Edward since June, 1996. At some point, the social service plan was changed from reunification to termination of her parental rights.

In October, 1993, Ms. Pixley started a job training program at Arch Training Center. When the training program ended in the summer of 1994, she was offered a position at Arch and began employment there. At some point in late February,

---

**2.** When asked, during the trial of this case, whether postpartum depression "was in fact the reason for your daughter's murder," Ms. Pixley responded "Yeah, that's what they say." She then stated that she did not understand what postpartum depression was, even though she had discussed it with her therapist. Dr. Susan Feister, a psychiatrist who testified for Ms. Pixley in this case, recounted, without objection, that a Dr. Carol Kleinman, the psychiatrist who evaluated Ms. Pixley with regard to her mental state at the time she killed Nakya, had concluded that she was suffering from postpartum depression arising from a variety of factors, including hormonal factors and a family history of depression, and that she was not in need of incarceration.

1995, while still on probation from the murder conviction, she commenced a scheme of credit card fraud. She obtained the names, addresses, birth dates, and social security numbers of four or five other Arch employees from the company's computer files, prepared and mailed credit card applications in their names, received credit cards, and charged merchandise on those cards, directing that some of the merchandise be sent to her grandmother's home. Through such a scheme, she obtained a VCR and various other household appliances. Ms. Pixley admitted that she did not purchase anything that was necessary for her children, that she already had credit on her own and did not need additional credit cards, and that she simply did not expect to get caught.

In April, 1995, Arch discovered what she had done and accepted her resignation in lieu of discharge. She lied to her probation officer about the reason for her termination, informing him that she left in order to return to school full time and thereby concealing her criminal behavior. She was then pregnant with her fourth child, Cornilous, fathered by a man she had known for only a short period. Although she informed one of her expert witnesses, Dr. Feister, that this pregnancy also was unintentional—"that she did not want to be pregnant [because] she felt she couldn't care for Edward and another baby too"—she testified, and informed other people, that the pregnancy *was* planned, although she gave different reasons at different times for why she wanted to get pregnant. At one point, she said that it was because she was lonely and wanted company. At another time, she said that life was good and, after having the child, she wanted to marry the father. The father denied that the pregnancy was planned and that he and Ms. Pixley were ever engaged. Whatever were her intentions when she became pregnant, she terminated the relationship with the father prior to Cornilous's birth, and, indeed, there is some discrepancy in her story as to how and when that occurred. In August, 1995, she decided, unilaterally, to resume custody of Carlos, without informing his grandparents; while exercising visitation, she refused to return him to the grandparents' home. That triggered the

involvement of a social service agency, the opening of a neglect case in the District of Columbia, and the return of Carlos to the custody of his grandparents, following which the neglect case was terminated.

The women's paths crossed again in the fall of 1995. Ms. Pixley was then pregnant with Cornilous. Ms. Blankman said that she received an unexpected invitation to a baby shower for Ms. Pixley, which she attended. Ms. Pixley invited Ms. Blankman to attend her in the delivery room, and Ms. Blankman made an effort to be present but arrived about a half hour after the baby was born. Cornilous was born in January, 1996. Judge Mitchell allowed Ms. Pixley to remain at home only for the first two weekends and then insisted that she resume her weekends at the halfway house. At Ms. Pixley's request, Ms. Blankman began caring for Cornilous on most of the weekends, picking him up from Ms. Pixley on Friday afternoon and returning him on Monday morning. When, on two occasions, Ms. Blankman was unavailable, the child was placed in an institution for the weekend. No family member came forth to care for the child. In light of what had happened to Nakya and in order to assist Ms. Pixley with Cornilous during the week, the District of Columbia Department of Health and Human Resources arranged for social workers from the Department's Families Together program to have almost daily contact with Ms. Pixley and with Cornilous—to visit her home and to transport her to therapy sessions and other places.

In March, 1996, Ms. Pixley's credit card fraud came to the attention of Federal agents, on the complaint of one of the persons defrauded, and, on March 12, Ms. Pixley was arrested and charged with mail fraud. As a result, in May, Judge Mitchell revoked her probation and directed execution of the five-to-fifteen year prison sentence. When other persons desired by Ms. Pixley proved unwilling to care for Cornilous and no family member volunteered to assist, Ms. Pixley, through a friend, asked Ms. Blankman to care for him on a full-time basis, which she agreed to do. That arrangement was to last only while Ms. Pixley was in jail. In July, 1996, she was

sentenced on the mail fraud charge to two months incarceration—one month in jail and one month in a halfway house, consecutive to the sentence being served for the murder—and ordered to pay a total of $1,139 in restitution. In January, 1997, however, Judge Mitchell reduced the murder sentence to two years, to be served at a halfway house. In March, after Ms. Pixley served the two months on the mail fraud conviction, she reported to the halfway house prescribed by Judge Mitchell but was not accepted because the facility could not accommodate Judge Mitchell's requirement that she remain there for two years. She was then re-incarcerated, in default of an acceptable halfway house arrangement, until November, 1997, when she was released to Milestone Place.

Ms. Blankman continued to care for Cornilous during this period. Initially, despite considerable inconvenience, she brought the child to visit Ms. Pixley at the District of Columbia jail on a regular basis, twice a week. In October, 1996, however, she decided to keep Cornilous, and the visits became less frequent, finally ending in December.[3] Ms. Blankman concealed her intent from Ms. Pixley, fearing that, if she disclosed her intent, Ms. Pixley would revoke her consent to Cornilous remaining in her custody.[4] In October, she told Judge Mitchell that she was caring for the child only while Ms. Pixley was in jail and that Ms. Pixley and Cornilous should be reunited. By December, Ms. Blankman had effectively cut off all contact with Ms. Pixley; she changed her telephone number from one unlisted number to another and declined to

---

**3.** In February, 1997, after this action commenced, the circuit court ordered supervised visitation at the sheriff's office. Those visits could not occur in February, however, because of Ms. Pixley's one-month incarceration on the Federal mail fraud sentence, and she failed to exercise her privilege in March, following her release to the halfway house, claiming that she had not read the order granting her the privilege. She visited with Cornilous twice in April and commenced regular visits in May, although she was late for 11 of the 23 visits thereafter.

**4.** Ms. Blankman testified that, at some point after October, 1996, she mentioned to Ms. Pixley that she wanted to adopt Cornilous and that Ms. Pixley responded, "No way."

respond to a letter from Ms. Pixley. In February, 1997, when it appeared that Ms. Pixley might be on the verge of being released into a halfway house, Ms. Blankman filed a petition for the adoption and, in the alternative, for custody of Cornilous. She was permitted to retain custody of Cornilous pending the litigation, subject to weekly supervised visitation with Ms. Pixley.

Although permanent custody was an alternative request, the case was tried principally as a contested adoption case. Ms. Blankman was seeking to terminate Ms. Pixley's parental rights and adopt Cornilous. The child's father consented to and recommended the adoption, but Ms. Pixley vigorously contested it. In addition to reports and recommendations from the guardian *ad litem* appointed for Cornilous and the court's adoption investigator, who reached opposite conclusions, a great deal of evidence was presented by psychologists, a psychiatrist, and social service workers regarding the parties, Cornilous, and what was in Cornilous's best interest. Apart from the facts recited above, it was essentially conceded that Carlos, Edward, and Cornilous had never been physically abused or neglected by Ms. Pixley, except to the extent that her absence due to incarceration rendered her unable to care for Edward or Cornilous. It was also conceded that the visits Ms. Pixley had with Cornilous while he was in Ms. Blankman's care were positive ones. Ms. Blankman stated that Ms. Pixley appeared to be a good, loving, and nurturing mother to him during those visits, that she was always happy to see him, that she held him appropriately, and that she never abused him. Ms. Blankman said that she knew from the beginning that she would have to return the child and that she had been warned by friends about the danger of becoming too involved with him.

By the time of trial, Ms. Blankman, then 27, had accepted employment as a police officer candidate for Montgomery County and was in training at the police academy; she expected to graduate in March, 1998. She remained unmarried and lived in a three-bedroom house with her mother. She was a college graduate with a good job and an unblemished back-

ground. Ms. Pixley was living at Milestone Place, which permits children to visit but not to reside there. If she were to receive custody of Cornilous, another facility, acceptable to Judge Mitchell, would have to be found. She had obtained her GED, was taking courses at the University of the District of Columbia, and was working part-time at a retail store for $6.15 an hour.

Cornilous's guardian *ad litem* recommended that the adoption petition be granted. In a written report summarizing the historical facts and her conversations with various witnesses and therapists, the guardian concluded, among other things, that Ms. Pixley had not been cooperative in releasing information, that she "is more concerned about her liberty than she is about reunification with Cornilous," that "Cornilous ha[s] been used by her as a legal tool to help her be released from prison for almost two years," that she had not remained involved with the child to the extent possible, and that, in general, Ms. Pixley "is not looking out for Cornilous' best interests, rather she is looking out for herself."[5] She stated that, if the court were to deny the petition for adoption, it should find that Ms. Pixley was "fit and capable of being Cornilous' primary caretaker," but concluded, overall, that the facts "support a finding by the Court of exceptional circumstances warranting the termination of parental rights." In that regard, she observed:

> "The minor child has been away from Respondent for approximately nineteen months due to her own criminal conduct, resulting in incarceration. The minor child was less than four-months old when Petitioner assumed his care, thus, Petitioner is the only mother he has known. Although Respondent has been attempting to reclaim the minor child, she has not been in a position to reclaim the child until her recent release from incarceration. A change of custody

---

**5.** Ms. Blankman and others also noted that Ms. Pixley, on a number of occasions, offered the dependency of Edward and Cornilous and her desire to be reunified with them as reasons for Judge Mitchell not to confine her to jail. They concluded that she was, in effect, using the children for her own purposes rather than having a genuine desire to resume custody of them.

would be detrimental to Cornilous because of both the strong emotional ties he has developed toward Petitioner and because of the unstable situation he would be placed in if placed in the custody of Respondent. Finally, the genuineness of Respondent's desire to have the minor child is lacking."

As noted, the court's adoption investigator reached a very different conclusion. She expressed "grave concerns in regard to [Ms. Blankman's] insensitivity to adoption issues and her inability to stay within normal societal boundaries." She was concerned that Ms. Blankman "would befriend a murderer via her place of work/education" and then betray that friendship. She felt that Ms. Blankman had betrayed a trust by presenting herself as a friend to Ms. Pixley, someone she could turn to for help, "and now is trying to take her child from her." The investigator regarded Ms. Blankman as deceitful and as "basically an informal foster parent who became too attached and is not willing to let go" and admonished that "[t]his should not be allowed." She noted that Ms. Blankman "believes that Cornilious is her son," that "she gets very upset when the term foster mother or foster care is used in describing the placement situation," and that "Ms. Blankman does not appear open to compromising in any way with Ms. Pixley." As to Ms. Pixley, the investigator determined that she had done "all that the court, DHS, her therapist, and society had asked of her," yet it appeared that "a vast number of people, including [Ms. Blankman], feel that she has not been punished enough."[6] The investigator noted that Ms. Pixley had never abused or neglected Cornilous, that she had excellent reports from her case manager at Milestone Place, and, what can only be regarded as an understatement of classic proportions, that "this would be a non-case if the murder had not occurred."

---

6. The investigator stated that Dr. Feister, an evaluating psychiatrist, "strongly feels that the system has got to stop punishing Ms. Pixley for the unfortunate murder of her daughter." Dr. Feister testified that she never made such a statement to the investigator, and that the investigator "misinterpreted" or "distorted" what she had said.

In her testimony, the investigator expressed the belief that a child should not be adopted if there is a family member available to raise the child, and she viewed Ms. Pixley's aunt as an available resource.[7] She believed that the wealth of services that Ms. Pixley would need in order to raise Cornilous would somehow be available in the District of Columbia, and, if they were not, perhaps Ms. Pixley could move to Maryland and stay with her aunt (whose telephone was "blocked" to preclude her adolescent son from receiving collect calls from prisoners). When questioned about her assumption that Ms. Pixley could move from Milestone Place to another facility that provided adequate services and allowed children in residence, she stated that she was unaware that the facility then under consideration did not have staff on duty full time, but only from ten to six o'clock, or that ex-offenders and recovering addicts also would be living there. She said that made no difference to her. The investigator made clear that any transfer of custody to Ms. Pixley would have to be gradual.

A great deal of evidence was taken with respect to all of the parties. Dr. Ronald Wynne, a clinical psychologist who, in 1995, had evaluated Ms. Pixley's parenting competence for the D.C. Superior Court in connection with what should be done with Edward, concluded that she was angry, mistrustful, and hyper-vigilant, and that she found it hard to establish intimacy with other people. Although he concluded that she did not have an elevated potential to be physically abusive, he opined that she was not realistic about what to expect from a child and he was not very hopeful that reunification with Edward would be successful. He concluded that she needed a lot of "bolstering" but did not believe that the District of Columbia social service agencies would be able to provide the needed support.

---

7. The investigator made no comment with respect to the aunt's unavailability to care for Cornilous, or Edward, during Ms. Pixley's incarceration. The aunt testified that she and Ms. Pixley did not maintain a close relationship until after Ms. Blankman announced her intention to adopt Cornilous.

A similar assessment came from Dr. Richard Gelles, a sociologist and teaching (but not clinical) psychologist. At the request of the D.C. authorities, Dr. Gelles had investigated and made recommendations with respect to Edward. In his May, 1996 report, he concluded that Ms. Pixley was unable to maintain adequate care for either Carlos or Edward, and he expressed "deep concerns" about the safety of Cornilous as well. Testifying in this case, he said that his particular area of expertise was family violence, and, from the research he conducted, he had developed certain risk factors for predicting the recurrence of child abuse and neglect. The best predictor, he said, was past behavior, but he identified a number of other factors as well, including age, education, income below the poverty level, number of children in the family, early onset of child-bearing, unwanted children, social isolation and lack of social support, various personality characteristics, unrealistic expectations with respect to child development, having been a victim of domestic violence, and stressful circumstances.

Upon his review of the various reports, Dr. Gelles concluded that Ms. Pixley was not a consistent, caring, concerned caretaker with acceptable parenting skills, that she could not meet Cornilous's best interest in the context of a halfway house setting, and that, although it was unlikely that she would fatally attack Cornilous, he would be in danger of maltreatment in other ways. Dr. Gelles's principal concern was that Cornilous would be neglected. In particular, he opined that the probability of neglect by Ms. Pixley was "quite a bit above 51%," that the probability of fatal attack was "quite a bit below 50%," but the probability of other physical abuse was "above 51%." In large measure, this view was prompted by his conclusion that, if severe maltreatment has already occurred, the likelihood of recurring maltreatment begins at 50%. Dr. Gelles expressed the belief that depression, which was offered as the explanation for the murder of Nakya, explains only about 10% of child abuse, implying that successful treatment of that problem would not substantially reduce the risk of further maltreatment.

**224**

Additional testimony favorable to Ms. Blankman came from Dr. M. Kathryne Jacobs, a clinical psychologist who had observed Ms. Blankman and Cornilous and administered a number of tests to them. She concluded that the child had a "completely typical standard strong positive attachment" to Ms. Blankman. Dr. Jacobs had never met Ms. Pixley, but, from the various reports, she concluded that Ms. Pixley would not be the kind of "salvaging parent" Cornilous would need if separated from Ms. Blankman. From Ms. Pixley's past behavior, Dr. Jacobs determined that "this is a woman who does not have very good judgment, does not think through her behaviors, tends to act on her emotions and to do what is comfortable for her at the time and has never shown her ability to put the welfare of the child ahead of her own comfort or desires at the time."

Ms. Pixley's case was supported principally by Dr. Susan Feister, a psychiatrist who had evaluated Ms. Pixley in the fall of 1996 and had done an update evaluation in December, 1997, and by Joanne Bragg, a counselor who provided ongoing therapy to Ms. Pixley since 1994. Dr. Feister had testified for Ms. Pixley in January, 1997, before Judge Mitchell, and concluded then that she would not be a danger to herself or anyone else, including her children. She opined in this case that Ms. Pixley had no personality disorders and that, "with appropriate therapeutic intervention," Ms. Pixley "would be able to appropriately parent her child." Dr. Feister expressed the belief that Cornilous began bonding with Ms. Pixley while still *in utero,* that that bonding continued in the first months of his life, and that it remained strong. On cross-examination, she disputed that Ms. Pixley had "murdered" Nakya, insisting that she had only "killed" her.[8] Dr. Feister acknowledged that Cornilous's growing up with the woman who had killed

8. As Dr. Feister had testified for Ms. Pixley in a proceeding before Judge Mitchell, we assume that she was aware that Ms. Pixley had pled guilty to second degree murder and, as a result of that plea, had been convicted of that crime. She was not asked, and did not volunteer, her view of the difference between murdering the child and killing her in light of the murder conviction and the facts surrounding the killing.

his sister, gave away his brother, Carlos, lost custody of his brother, Edward, and had engaged in credit card fraud could have "a profound effect" on the child, and that those "complicated issues" would need to be dealt with by Ms. Pixley. She also acknowledged that bonding and attachment issues represented a small part of her clinical practice and that she was not a person having "a tremendous amount of expertise in such issues...."

Ms. Bragg, a licensed professional counselor with a degree in agency counseling who referred to herself as a "psychotherapist," stated that she had provided individual psychotherapy to Ms. Pixley since 1994. She believed that Ms. Pixley could live in the community with Cornilous, basing that opinion on the fact that she had lived with the child in the community prior to her incarceration. Ms. Bragg described Ms. Pixley, as of 1994, as young, immature, impulsive, exercising poor judgment, and in need of both psychotherapy and pervasive socialization, but said that she had matured "to become a very responsible young woman." Although she expressed the belief that Ms. Pixley had "been as honest with me as she possibly could," she acknowledged that Ms. Pixley had not told her about the credit card fraud until after she lost her job, that she had not discussed her plan to become pregnant with Cornilous or her relationship with Cornilous's father, and that Ms. Pixley had not been entirely truthful with respect to her attempt to regain custody of Carlos.

Principally upon this evidence, the court rendered its decision on December 22, 1998. In conformance with how the case had been tried, the court's focus was on the petition for adoption, and its analysis was keyed to the factors set forth in § 5–312 of the Family Law Article with respect to unconsented independent adoptions. In summary, that section permitted such an adoption by a person who had exercised physical care and custody of the child for at least six months if the court found, by clear and convincing evidence, that (1) it was in the child's best interest to terminate the natural parent's rights; (2) the child had been out of the parent's custody for at least one year; (3) the child had developed significant

feelings toward and emotional ties with the adopting parent; and (4) the natural parent had failed to maintain meaningful contact with the child despite an opportunity to do so, had repeatedly failed to contribute to the physical care and support of the child although financially able to do so, or had been convicted of child abuse of "the child." [9]

The court began by announcing its general finding that Ms. Blankman had failed to meet her burden of proof. It noted the presumption that it is in the best interest of a child to be raised by the natural parent—a presumption "rooted in a belief that there is a greater desire on the part of the natural parent to properly care for the child"—and acknowledged that the presumption may be overcome by evidence that the natural parent is unfit or of exceptional circumstances. It identified ten factors to consider in determining whether exceptional circumstances exist and made findings with respect to them, as follows:

(1) *Length of time the child has been away from the natural parent:* The court found that Cornilous had been away from Ms. Pixley for 20 months, but concluded that, given his young age, that factor did not weigh in favor of severing the parental ties.

(2) *Age of child when care assumed by third party:* Cornilous was between three and four months old when placed in Ms. Blankman's care and thus, according to the court, had no concept of time or abandonment.

(3) *Emotional effect on child of change of custody:* The court found that Cornilous had established a strong bond with Ms. Blankman and would suffer a negative emotional effect from a change. The court noted that the experts disagreed on

---

**9.** Following the circuit court's decision in this case, the General Assembly amended § 5–312 to include, as additional factors, that the natural parent had (1) abused another of his or her children, (2) subjected "the child" to torture, chronic abuse, or sexual abuse, (3) been convicted of a crime of violence or of aiding, conspiring, or soliciting to commit a crime of violence, or (4) involuntarily lost parental rights of a sibling of the child. *See* 1998 Md. Laws, ch. 629.

the magnitude of that effect, but accepted Dr. Feister's view that the effect would be short-lived.

(4) *Delay in natural parent's attempt to regain custody:* Ms. Pixley acted promptly when informed of Ms. Blankman's attempt to adopt Cornilous.

(5) *Nature and strength of ties between child and third party:* The court found that the ties with Ms. Blankman were strong but were never exclusive; *i.e.*, Ms. Pixley had always remained involved in Cornilous's life.

(6) *Intensity and genuineness of parent's desire to have the child:* Based on its assessment of Ms. Pixley's conduct and demeanor, the court rejected the guardian *ad litem's* view and found Ms. Pixley's desire genuine and not just for purposes of escaping incarceration.

(7) *Stability and certainty as to child's future:* That factor, the court held, weighed in Ms. Blankman's favor. Ms. Blankman had a good home and stable employment, whereas Ms. Pixley's arrangements had "an element of uncertainty." Ms. Blankman had been law-abiding and Ms. Pixley clearly had not. Nonetheless, the court did not give singular significance to that factor. It seemed to assume that the wealth of therapy and other services that Ms. Pixley would need would, in fact, be provided. It declared that her living environment was "very much a factor of socioeconomic factors" beyond her control and therefore deserving of little weight; that the murder of Nakya was the product of postpartum depression and did not "pose a threat of death or fatal abuse" to Cornilous; that it was not likely, in light of her progress in therapy, that Ms. Pixley would neglect Cornilous; and that the credit card offense showed poor judgment but did not suffice to forfeit her rights to the child. Although noting that Ms. Pixley's current job was temporary, the court observed that she had "taken advantage of opportunities presented to her to make herself more employable, having obtained her GED since she came under the court's jurisdiction and having enrolled in college classes in computer at [University of Dis-

trict of Columbia]." Finally, as to this factor, the court found no history of drug or alcohol abuse by Ms. Pixley.

(8) *Effect of having one or both relationships continue:* The court found that the long-term benefit of Cornilous being raised by Ms. Pixley outweighed the short-term detriment that would be caused by severing his ties with Ms. Blankman.

(9) *Abandonment:* The court found no abandonment by Ms. Pixley.

(10) *Failure to support or visit the child:* The court found that Ms. Pixley supported and visited the child as best she could. It attributed the 11 times she was late for visitation to factors beyond her control.

Upon this analysis, and returning to the statutory factors, the court declared that Ms. Blankman had failed to show, by clear and convincing evidence, that it was in Cornilous's best interest to terminate Ms. Pixley's parental rights, that Ms. Pixley failed to maintain meaningful contacts with the child, or that she failed to contribute to his physical care and support, though financially able to do so. Acknowledging Ms. Blankman's subjective belief that she had been acting in Cornilous's best interest, the court found that her assessment was "colored by her emotional attachment to Cornilous and, therefore, in that sense, her self-interest." It retained Ms. Blankman as a temporary guardian and directed counsel, with the assistance of Dr. Jacobs, to formulate a transition plan for returning custody of Cornilous to Ms. Pixley within 60 days. The court did not mention in its remarks § 9–101 or § 9–101.1 of the Family Law Article and made no specific findings with respect to those statutes.

In response to a motion to stay, the court addressed a number of issues raised by Ms. Blankman, among them being that the court had applied a clear and convincing evidence standard, which was appropriate with respect to the adoption petition but not with respect to custody. The court denied that it had applied that standard with respect to the issue of custody and stated in a supplemental opinion and order its finding that Ms. Blankman "failed to establish by a preponder-

ance of the evidence that [Ms. Pixley] was unfit or that exceptional circumstances existed as of December 22, 1997." It repeated its conclusion that it was in Cornilous's best interest that he be returned to Ms. Pixley. The court denied the motion for stay and directed a transitional arrangement looking toward a complete transfer of custody by April, 1998. Ms. Blankman did not raise the application of §§ 9–101 or 9–101.1 in her motion to stay, and the court made no comment with respect to them.

As we observed, the Court of Special Appeals affirmed the circuit court judgment, concluding that, to the extent § 9–101 was applicable, the court complied with the statutory requirements, the court was not clearly erroneous in its fact-finding, and the court gave appropriate consideration to Nakya's murder and to Ms. Pixley's handling of Carlos and Edward. We granted *certiorari* to consider three issues: (1) is § 9–101 applicable; (2) if applicable, did the court comply with its mandate; and (3) did the court err in applying the common law presumption favoring custody with Ms. Pixley in light of the fact that she murdered one of her other children? Because of our conclusions with respect to § 9–101, we need not address the third question.

## DISCUSSION

As the Court of Special Appeals noted, § 9–101 of the Family Law Article needs to be considered together with § 9–101.1.

Section 9–101 provides:

"(a) In any custody or visitation proceeding, if the court has reasonable grounds to believe that *a* child has been abused or neglected by a party to the proceeding, the court shall determine whether abuse or neglect is likely to occur if custody or visitation rights are granted to the party.

(b) Unless the court specifically finds that there is no likelihood of further child abuse or neglect by the party, the court shall deny custody or visitation rights to that party, except that the court may approve a supervised visitation

arrangement that assures the safety and the physiological, psychological, and emotional well-being of *the* child." (Emphasis added.)

Section 9–101.1, after defining the term "abuse," provides, in subsections (b) and (c):

"(b) In a custody or visitation proceeding, the court shall consider, when deciding custody or visitation issues, evidence of abuse by a party against:

(1) the other parent of the party's child;

(2) the party's spouse; or

(3) any child residing within the party's household, including a child other than the child who is the subject of the custody or visitation proceeding.

(c) If the court finds that a party has committed abuse against the other parent of the party's child, the party's spouse, or any child residing within the party's household, the court shall make arrangements for custody or visitation that best protect:

(1) the child who is the subject of the proceeding; and

(2) the victim of the abuse."

Ms. Blankman looks to the requirement of § 9–101(b) that, when the court has reasonable grounds to believe that *a* child has been abused or neglected by a party, it "shall" deny custody to that party unless it specifically finds that there is "no likelihood" of further child abuse or neglect by that party. Nakya, she contends, was *a* child of Ms. Pixley who, by virtue of her murder, was certainly abused by Ms. Pixley. It was therefore incumbent on the court to deny Ms. Pixley custody of Cornilous unless it made the requisite finding that there was no likelihood of further abuse or neglect on the part of Ms. Pixley. The court never made such a finding, she avers, and its judgment was therefore infected with legal error. The court's finding that there was no threat of "death or fatal abuse," she argues, does not suffice.

Ms. Pixley responds that (1) Ms. Blankman did not properly raise this issue in the circuit court and has therefore waived

her right to raise it on appeal; (2) even if preserved, § 9–101(b) applies only when the child previously abused is the same child whose custody is currently under consideration, which is not the case here; and (3) the court essentially made the requisite finding and, if it did not, the error was harmless.

### *Preservation*

■ When, in February, 1997, Ms. Blankman filed her petition for adoption, she was concerned that Ms. Pixley would immediately reassert her parental right to custody of Cornilous, so she filed with that petition, prior to its service on Ms. Pixley, an *ex parte* petition for temporary custody pending the litigation. In that *ex parte* petition, she urged that it was in Cornilous's best interest to remain in her temporary custody and, in support of that averment, she cited §§ 9–101 and 9–101.1, together, for the proposition that the court must consider previous acts of abuse and neglect of "other children" when ruling on custody and visitation and must deny custody to the abusive party unless it finds no likelihood of further abuse or neglect. The court awarded Ms. Blankman temporary custody but provided for supervised visitation by Ms. Pixley. In September, 1997, Ms. Pixley requested that she be given extended, unsupervised visitation, and, in response to that motion, Ms. Blankman again cited both § 9–101 and § 9–101.1, averring that, in light of Ms. Pixley having murdered another child, the court must make a specific finding that there was no likelihood of further abuse. The point was argued by her at the hearing on the motion.

That was the last time she mentioned § 9–101, however. It was not argued at trial, and, as noted, it was not argued in Ms. Blankman's motion to stay the court's order. The guardian *ad litem* never mentioned it in her report to the court, or in her testimony. Nonetheless, it had been brought to the judge's attention in the context of both custody and visitation, albeit in *pendente lite* proceedings.[10] Also significant is the

---

10. We do not suggest that raising an issue in a *pendente lite* proceeding will suffice in all instances to preserve it for appeal when the point is

fact that Ms. Pixley never raised the preservation issue in the Court of Special Appeals, and that court ruled on the applicability and satisfaction of § 9–101. Indeed, the first question raised in Ms. Blankman's petition for *certiorari* was whether the Court of Special Appeals erred in its ruling. Ms. Pixley did not raise the preservation question in her answer to the petition for *certiorari* or in a cross-petition. The issue was mentioned by her for the first time in her brief in this Court. Even assuming that the statutory direction is a matter that could be waived, these circumstances militate against our declining to address the substantive issue on the ground of waiver or non-preservation.

### *Applicability of § 9–101*

On the merits of the issue, Ms. Blankman points out that § 9–101(a) requires that if the court has reasonable grounds to believe that "a" child has been abused or neglected, it must, under subsection (b), deny custody to the party responsible for that abuse or neglect unless it finds no likelihood of further abuse or neglect by that party. Use of the indefinite article "a" in subsection (a), she urges, evidences a legislative intent that the abuse of *any* child by the party suffices to invoke the requirement of subsection (b). She cites *Wright v. State*, 349 Md. 334, 355, 708 A.2d 316, 326 (1998) and Webster's dictionary for the proposition that the indefinite article "a" connotes a broader universe than the definite article "the." She notes, as well, the anomaly that would accrue from a contrary

---

never raised before the judge who tries the case on its merits. In the absence of a rule or statute providing otherwise, if the issue is relevant to a decision required to be made by the trial judge and that judge did not handle the *pendente lite* proceeding and has no particular reason to be familiar with it, failure to raise the point at trial ordinarily will constitute a waiver of it for purposes of appeal. In this case, however, the same judge handled the case from the beginning. He had been alerted to the statute and to Ms. Blankman's argument that, absent a specific finding under § 9–101(b), custody could not be awarded to Ms. Pixley. Because the focus of the case was on the adoption, it was, perhaps, understandable that § 9–101, which applies only to custody and visitation cases, was not mentioned at trial, but, in the custody context, it was raised by Ms. Blankman and responded to by Ms. Pixley.

interpretation, of a custody case involving two or more children, only one of whom had previously been abused or neglected by a party. Only that child, and not his or her siblings, would have the benefit of the statute, which could lead to the children being split and the non-abused or non-neglected children being placed in danger.

Ms. Pixley offers a triple response. First, relying to some extent on the legislative history of § 9–101, she avers that the Legislature's concern behind that statute was over the child who previously had been abused, and she therefore construes the article "a" in subsection (a) as meaning the child whose custody or visitation is at issue. She observes that to require a specific finding that there is no likelihood of *further* abuse or neglect to a child who has not previously been abused or neglected stretches the statute beyond its plain meaning. Second, she urges that §§ 9–101 and 9–101.1 must be read together, that § 9–101.1 clearly and unmistakably covers the situation of another child of the party having been abused and yet does not require the specific finding stated in § 9–101. Ms. Blankman's reading of § 9–101, she posits, would render § 9–101.1 surplusage. Those responses focus on statutory construction. Ms. Pixley also contends that, to read § 9–101 as applying to what she regards as "3rd party cases" would render the statute unconstitutional, as it would overcome the presumption favoring a natural parent on the basis of just one factor, rather than on the basis of the overall best interest of the child.

In ·dealing with the issue of statutory construction, our goal is to discern and effectuate the intent of the legislature at the time it enacted the statute. *Brown v. Housing Opportunities Comm.,* 350 Md. 570, 714 A.2d 197 (1998). If the statutory language is clear and unambiguous and is consistent with the purposes of the legislation in general and the particular provision being interpreted, our inquiry usually ends at that point. *Philip Electronics v. Wright,* 348 Md. 209, 703 A.2d 150 (1997); *Sears v. Gussin,* 350 Md. 552, 714 A.2d 188 (1998). If the language is unclear or ambiguous, "we seek

to discern the intent of the legislature from surrounding circumstances, such as legislative history, prior case law, and the purposes upon which the statutory framework was based." *Philip Electronics, supra,* 348 Md. at 217, 703 A.2d at 153.

 We find no patent ambiguity in the wording of § 9–101. Ordinarily, as Ms. Blankman points out, use of the indefinite article "a" indicates an intent that the noun following not be individualized or restricted; the word "a," when so used, is often the equivalent of "any." *See* BLACK'S LAW DICTIONARY, 6th ed. at 1; *Lewis v. Spies,* 43 A.D.2d 714, 715, 350 N.Y.S.2d 14, 17 (1973). That reading is not called into question or made ambiguous, as Ms. Pixley suggests, by the reference in § 9–101(b) to "further" abuse. The statute dictates that, if the court, in a custody or visitation proceeding, has reasonable grounds to believe that a child—any child—has been abused or neglected by a party to the proceeding, the court must determine whether abuse or neglect is likely to occur if custody or visitation rights are granted to that party—the party responsible for the abuse or neglect. Unless the court specifically finds that there is no likelihood of further abuse or neglect by that party, it must deny custody or visitation rights to that party except for a supervised visitation arrangement that assures the safety and the physiological, psychological, and emotional well-being of the child. It is not, as Ms. Pixley suggests, a matter of looking at the prospect of further abuse of a child who has never been abused; rather, it is a matter of assuring that the party responsible for abusing or neglecting a child in the past will not abuse or neglect the child or children whose custody or visitation is within the court's control, whether or not they were the ones subjected to the previous abuse or neglect. The focus is not on a particular child but on the party guilty of the previous abuse or neglect.

The legislative history of § 9–101 supports that plain reading of the statute. Senate Bill 320 (1984), which was enacted as § 9–101, was one of several bills recommended to the General Assembly in the Preliminary Report of the Governor's Task Force on Child Abuse and Neglect. The bill was enact-

ed precisely in the form recommended by the Task Force. It is clear from the Preliminary Report that the Task Force's concern was not just the particular child who may have been abused or neglected but all minor children in the household of the abuser. With respect to the proposal that became § 9–101, the Task Force said in its cover letter to the Governor:

"Following a preliminary review, the Task Force found that when allegations of abuse arise in disputed custody or visitation proceedings, the courts often fail to order the safeguards needed to protect children. For this reason, the Task Force recommends legislation requiring that abuse or neglect be considered if raised in the course of a custody or visitation proceeding and that visitation or custody be denied or modified if necessary to protect a child."

In the Report itself, the Task Force summarized its proposed bill as follows:

"This bill expressly requires a court to restrict or deny custody or visitation rights to a party if abuse or neglect has previously occurred and there is any likelihood that abuse or neglect may continue to occur. The court may deny custody or visitation or order supervised visitation in such cases."

Report, *supra,* at 5.

This language makes clear that the focus of the Task Force was on the person guilty of the abuse or neglect and was not limited to the particular child who had previously been abused or neglected. Its desire was to make certain that *no* child whose custody or visitation was subject to the court's control would be placed with such a person unless the court was convinced that there was no likelihood of further abuse or neglect on the part of that person. That is the way in which the State Department of Health and Mental Hygiene viewed the proposal as well. In its position paper filed with the Senate Judicial Proceedings Committee, the Department stated that the bill required that attention be given by the court to those custody and visitation cases "where the possibility of child abuse or neglect has occurred" and that, if it has

occurred, "consideration must be given to the likelihood of abuse/neglect occurring in the custody/visitation situation." The Department continued, "[i]f likely, the court shall deny custody/visitation rights or may approve a supervised visitation arrangement."

Immediately on the heels of the enactment of § 9–101, the Court of Special Appeals decided *Arnold v. Naughton,* 61 Md.App. 427, 486 A.2d 1204, *cert. denied,* 303 Md. 295, 493 A.2d 349 (1985). In that case, the trial court found that a father, while exercising visitation with his two young daughters, had sexually abused one of them. The court invoked § 9–101 to require supervised visitation as to *both* children. The mother appealed, complaining that all visitation should have been denied. The appellate court affirmed the judgment, leading the Legislature, at its next session, to amend § 9–101 to require a court to consider not only the safety of the children whose custody or visitation was in issue but also their physiological, psychological, and emotional well-being. *See* 1985 Md. Laws, ch. 659. The relevant point is that, in the face of *Arnold,* and, indeed, upon the testimony of Ms. Arnold complaining about the decision, the General Assembly implicitly accepted the court's view that § 9–101 applied not only with respect to the child who had been abused, but equally with respect to her sister, who had not been abused.

This construction of § 9–101 does not, as Ms. Pixley suggests, make § 9–101.1 superfluous. Although that section certainly does address the kind of situation at issue here— abuse directed against a child other than the one whose custody or visitation is at issue—it has a much broader focus. Section 9–101.1, first enacted in 1991 and strengthened in 1995, deals not just with abuse by a party that has been directed against a child but also with abuse by that party directed against the other parent of the child or the party's current spouse. The legislative history of § 9–101.1 indicates recognition by the Legislature of a deep concern over the effect on a child of being in the maelstrom of *any* domestic violence within the home, including the abuse of adults and other children, whether or not those victims are related to the

child whose custody or visitation is at issue. Testimony and letters presented to the legislative committees both in 1991 and in 1995 stressed the adverse effects on children from abusive households generally, not only the psychological harm derived from witnessing violence directed against other household members, but also the greater likelihood, statistically demonstrated, that violence directed against others, including adults in the home, will eventually be directed against them as well, and the need for courts to give due consideration to such violence in determining what is in a child's best interest. The legislative decision to include abuse directed against siblings within the ambit of § 9–101.1, as part of the more comprehensive reach of that section, in no way suggests that such abuse is not also within the ambit of § 9–101. Construing § 9–101 in the manner urged by Ms. Blankman does not make either statute superfluous or inconsistent with the other.

We find no greater merit in Ms. Pixley's constitutional argument. She seems to acknowledge that, if restricted to the situation where the child whose custody or visitation is at issue was abused, the statute would pass constitutional muster and finds a problem only when custody is denied because the parent has abused another child. We fail to see the distinction. As a preface, it is important to note that § 9–101 does not provide a basis for terminating parental "rights," does not capriciously interfere with a parent's fundamental liberty interest in raising his or her child, and does not set an impossible burden for a parent. A parent, after all, has no right, fundamental or otherwise, to abuse or neglect his or her children.

Significant abuse or neglect of a child may lead to the termination of parental rights (Md.Code, § 5–313 of the Family Law Article) and it may lead to the loss of custody upon a finding by a Juvenile Court that the child is in need of assistance (Md.Code, Cts. & Jud. Proc. Article, §§ 3–802, 3–820). In a contested custody action between private individuals, evidence of abuse or neglect has always been relevant under general equitable principles with respect both to the fitness of a parent to have or retain custody and to the general

consideration of the child's best interest. Even without regard to § 9–101, if the court concludes that there is a likelihood of a party subjecting a child to abuse or neglect, whether that conclusion is drawn from evidence of past abuse directed against the child whose custody or visitation is at issue or against another child, it has been authorized to deny custody to and limit visitation with that party.

Section 9–101 focuses the court's attention and gives clear direction in the exercise of its discretion. It does not set an insurmountable burden; even upon substantial evidence of past abuse or neglect, it does not require a finding that further abuse or neglect is impossible or will, in fact, never occur, but only that there is no likelihood—no probability—of its recurrence. Webster defines likelihood as probability, something that is likely to happen. Nor would § 9–101, under our construction, tie the court's hands or substitute a single, arbitrary factor for the governing best interest analysis, as Ms. Pixley·contends. If the law may properly presume that, in the absence of clear and convincing evidence to the contrary, a child's best interest is served by being in the custody of a birth parent rather than someone else, it may, in light of the evidence presented to the Legislature, also presume that a child's best interest is not served by placing the child in the custody of someone with a history of abusing children, absent a finding that further abuse by that party is not likely. Section 9–101 does not scrap the overall best interest of the child standard in favor of another single, alternative standard, as suggested by Ms. Pixley, and it does not absolutely preclude a parent who has previously abused or neglected his or her child from ever having custody or visitation. It merely requires the court, when faced with a history of child abuse or neglect by a party seeking custody or visitation, to give specific attention to the safety and well-being of the child in determining where the child's best interest lies and not place the child in harm's way. There is nothing unconstitutional about that requirement.

We conclude, therefore, that § 9–101 applies when the abuse was directed against a sibling of the child, in this

instance, Nakya. The court was therefore obliged to determine "whether abuse or neglect is likely to occur if custody or visitation rights" were granted to Ms. Pixley, and, unless it specifically found that "there is no likelihood of further child abuse or neglect" by her, to deny custody and unsupervised visitation.

### Compliance With § 9–101

Ms. Pixley urges that, even if § 9–101 is applicable, it was satisfied. The court's finding that she did not pose "a threat of death or fatal abuse to Cornilous" coupled with its finding that the concerns expressed by Ms. Blankman's witnesses were unconvincing and the absence of any evidence that Cornilous, Carlos, or Edward were ever abused, was the equivalent, she says, of a finding that there was "no likelihood of further abuse or neglect." We do not agree. The statute requires, when there are reasonable grounds to believe that a child has been abused or neglected, that the court make a specific finding of "no likelihood of further child abuse or neglect by the party." The statute requires more than a finding that Ms. Pixley posed no threat of death or fatal abuse, and it does not envision an appellate court assuming the required finding from other disparate statements by the trial judge.

The fact is that no witness, even those testifying for Ms. Pixley, opined that there was no likelihood of further abuse or neglect by Ms. Pixley. At best, they concluded that Ms. Pixley had made significant progress in socialization and parenting skills and believed that, if she continued in therapy and received the other extensive services she required, she would be able to raise Cornilous appropriately. Significantly, although the court found the views of Ms. Pixley's witnesses to be more accurate than those of Ms. Blankman's witnesses, it made clear that it was "not persuaded to accept either set of experts in toto." We do not find in this record anything approaching an acceptable equivalent to the required statutory finding, and, for that reason, must direct that the judgment be vacated and the case remanded for further proceedings.

On remand, the court may take evidence with respect to the current situation. It will have to determine from all of the evidence whether, in light of Ms. Pixley's murder—not killing, but murder—of Nakya, there is any likelihood of her abusing or neglecting Cornilous. Obviously, in light of the findings it makes and articulates, the court will have to take account of the requirements of §§ 9–101 and 9–101.1.

JUDGMENT OF COURT OF SPECIAL APPEALS RE-VERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE JUDGMENT OF CIR-CUIT COURT FOR MONTGOMERY COUNTY AND RE-MAND TO THAT COURT FOR FURTHER PROCEED-INGS IN CONFORMANCE WITH THIS OPINION; COSTS IN THIS COURT AND COURT OF SPECIAL AP-PEALS TO BE PAID BY RESPONDENT.

CATHELL, J., files concurring opinion.

CATHELL, Judge, concurring.

I concur with the result reached by the majority. I write separately, however, to respectfully express my belief that the majority does not go far enough in addressing the central issue in this case.

It is my view that a parent convicted of murdering one of his or her children should be presumed an unfit parent, without the necessity of any evidence other than the murder conviction. In such circumstances, there should be a rebutta-ble presumption that the child's best interests lie elsewhere.

This Court has the power to modify the common law, so long as such modification does not conflict with constitutional or valid legislative provisions. Although the General Assem-bly has extensively promulgated legislation in the field of child custody, I know of no legislation that defines "best interest" in a manner that would conflict with what I believe the Court should do in the case at bar. In the case before us today, the Court should exercise its collective common sense and modify the common law to afford additional protection to the surviv-

ing children of a parent who has been convicted of murdering a sibling.

The majority opinion holds that on remand, the trial court "will have to determine from all of the evidence whether, in light of Ms. Pixley's murder ... of Nakya, there is any likelihood of her abusing or neglecting Cornilous." I would hold that there should be a rebuttable presumption that there is a likelihood of neglect, abuse, or worse of surviving children when a parent has a history of murdering his or her children. In my view, to hold otherwise, as the majority opinion invites the trial court to consider doing, is to replace hard facts and common sense with the inherently uncertain opinions of those in the mental health industry. Any such opinion that there is no likelihood of future neglect or abuse when a parent has a history of murdering his or her own child should be, I respectfully suggest, rejected unless very strong evidence exists to the contrary. If there is to be error in determining custody in a situation such as this, it should be on the side of protecting the children, not protecting the interests of the parent.