814 A.2d 543

**Lawrence J. SHURUPOFF**

v.

**Carol E. VOCKROTH, et vir.**

**No. 31, Sept. Term, 2002.**

Court of Appeals of Maryland.

Jan. 7, 2003.

Thomas G. Bodie (Bodie, Nagle, Dolina, Smith & Hobbs, P.A., on brief), Towson, for petitioner.

Laura V. Bearsch (Love, Fleming, Bearsch & Attanasio, LLC, on brief), Bel Air, for respondents.

Argued Before BELL, C.J., and ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

WILNER, Judge.

In *Ross v. Hoffman*, 280 Md. 172, 372 A.2d 582 (1977), we announced standards and guidelines for the judicial resolution of child custody disputes between the child's parent and someone who is not the child's parent—a third party. Synthesizing holdings and statements from earlier cases, we made clear, first, that "the best interest of the child standard is always determinative in child custody disputes," including those kinds of cases. *Id.* at 178, 372 A.2d at 587. More particularly, we held that, in disputes between a parent and a third party, "it is presumed that the child's best interest is subserved by custody in the parent," but "[t]hat presumption is overcome and such custody will be denied if (a) the parent is unfit to have custody, or (b) if there are such exceptional circumstances as make such custody detrimental to the best interest of the child." *Id.* at 178–79, 372 A.2d at 587.[1] We then stated:

> "[I]n parent-third party disputes over custody, it is only upon a determination by the equity court that the parent is

---

[1]. As a purely grammatical matter, we are not sure why, in describing the presumption, our predecessors used the word "subserved," which

unfit or that there are exceptional circumstances which make custody in the parent detrimental to the best interest of the child, that the court need inquire into the best interest of the child in order to make a proper custodian disposition."

*Id.* at 179, 372 A.2d at 587. Those statements and conclusions have been confirmed by us on a number of occasions and, except as stated later in this Opinion, remain expressive of the Maryland law. *See Sider v. Sider,* 334 Md. 512, 531, 639 A.2d 1076, 1085 (1994); *Monroe v. Monroe,* 329 Md. 758, 773–74, 621 A.2d 898, 905 (1993).

This appeal arises from a battle over the custody of Kimberly S., nearly twelve years old at the time of trial. The disputants are Kimberly's father (petitioner here) and her maternal grandparents, the Vockroths. After hearing seven days of testimony and considering the wishes expressed by Kimberly, the Circuit Court for Harford County granted custody of Kimberly to the grandparents, with whom she had been living for about a year. Petitioner complains that (1) the court did not apply the proper standard of proof in determining that the presumption announced in *Ross v. Hoffman* had been rebutted, (2) the court misapplied the *Ross v. Hoffman* standards in any event, and (3) those standards are in need of some modification and clarification.

We agree that some clarification is necessary, and we shall provide it, but we do not agree that the court applied an incorrect standard of proof, that it erred in its application of the *Ross* standards, or that its ultimate conclusion constituted legal error or an abuse of discretion.

### BACKGROUND

Kimberly is the child of petitioner and Pamela Vockroth. Petitioner and Pamela met and began living together in 1980,

---

means to serve in a subordinate or inferior capacity, to be useful or helpful to some purpose or cause. In context, "served" is probably a better descriptive word.

when both were employed in the Washington, D.C. area. In January, 1985, they moved to Michigan. In early 1987, Pamela announced that she was pregnant. The relationship at that time was somewhat strained, and, indeed, petitioner initially doubted whether he was the father and urged Pamela to abort the pregnancy. She refused and, in the spring, returned to her parents' home in Maryland. Kimberly was born here in October, 1987. She and Pamela lived with the Vockroths until December, 1988, when they moved into an apartment about 10 minutes away. The Vockroths cared for Kimberly, both when she was staying with them and after she and Pamela moved.

Petitioner was not immediately informed of Kimberly's birth, and, although he and Pamela discussed reconciliation on a number of occasions, he apparently did not see the child until she was a year old. Thereafter, he had only sporadic contact with Kimberly and did not provide regular support for her. In April, 1989, petitioner and Pamela married but remained for a time in their separate residences. Pamela and Kimberly moved to Michigan in August. Pamela did not seek employment but instead stayed home to care for Kimberly. Once again, the relationship began to deteriorate, apparently over Pamela's drinking and excitable behavior. There was evidence that Pamela was a chronic abuser of alcohol; there was also evidence that she was a manic-depressive. In May, 1990, without notice, she and Kimberly returned to Maryland and took residence in her parents' home. Petitioner visited Pamela from time to time and there was some telephone contact, but he had little contact with Kimberly. During this period, the Vockroths were deeply involved with Kimberly and provided financial support for her and Pamela. In December, Pamela and Kimberly moved to a nearby apartment. The Vockroths continued to support them and remained involved with the child, taking her to medical and dental appointments and participating in various other activities with her.

In April, 1991, after but two years of marriage, Pamela and petitioner were divorced. The judgment of the Michigan court gave them joint legal custody of Kimberly but awarded sole physical custody to Pamela. It made no provision for

specific visitation but did order petitioner to pay child support, which he then began faithfully to do. Petitioner, a patent lawyer, visited with Kimberly on a number of occasions, but only when business or some other activity took him to the Maryland area, and those visits lasted only a few hours. During the period 1992–1994, petitioner took Kimberly on two trips to Florida to visit his parents, on two overnight trips to New York, and on two apparently overnight trips to an amusement park. Additionally, in 1994, Kimberly spent six days with him in Michigan. During that visit, she wrote a number of letters to the Vockroths in which she complained that she was homesick and unhappy.

In 1992, Pamela met and began living with Charles Hall. Eventually, the household ·consisted of Pamela, Kimberly, Hall, and Hall's two daughters, one of whom was Kimberly's age and one a year older. Hall helped Pamela with her drinking problem and also helped to raise Kimberly. He and the child became close enough for Kimberly to begin referring to Hall as "daddy." She also became close with Hall's children. The Vockroths remained a part of Kimberly's life, visiting her several times a week and taking her to their home on weekends. Petitioner made no attempt to alter the custody arrangement, even when Pamela and Hall were evicted from their apartment and were forced to live, for a time, in a small trailer in need of repair. Nor, except for a visit to New York in 1995, did he have any extended visits with the child in 1995, 1996, 1997, or 1998.

In 1995, petitioner met Maria and, within six months, began living with her. Shortly thereafter, Maria became pregnant; the baby was born in September, 1996. Petitioner did not disclose the child's existence to Kimberly until 1998. In the summer of 1997, Kimberly informed petitioner that she wanted to visit him in Michigan but, because petitioner had just started a new, and stressful, job, he was unable to accommodate her. Meanwhile, Kimberly was spending every other weekend and several weeks during the summer with the Vockroths, who also took her on other excursions. She had

her own room at their house. Petitioner visited Kimberly in Maryland six to eight times in 1997 and 1998.

On August 11, 1998, Pamela suffered a stroke which, twelve days later, proved fatal. Immediately after the stroke, Kimberly went to stay with the Vockroths. Petitioner was notified and came to Maryland in connection with a planned business trip. He saw Kimberly several times during the week but did not exercise any overnight visitation. After consulting an attorney in Michigan, however, he did discuss with the Vockroths taking Kimberly back to Michigan. One of those discussions occurred immediately after Pamela's funeral, at the Vockroths' home.

The testimony was in some dispute regarding that conversation, but it apparently was a pivotal event. It is clear that, after the funeral, petitioner went to the Vockroth home, with their permission, and spoke privately with Kimberly in the kitchen. He either asked her whether she wanted to return with him to Michigan (his version) or told her that he was taking her (her and the Vockroths' version), but, in either event, she kept saying "no, no, no" and began to cry. At that point, Mrs. Vockroth intervened and had Kimberly leave the room. When Mr. Vockroth entered, Mrs. Vockroth left the room to console Kimberly, and petitioner and Mr. Vockroth continued the conversation. It was clear that Kimberly was distraught, the Vockroths were upset, and the battle lines were drawn. The Vockroths were no longer supportive of contact between Kimberly and petitioner and acted to make such contact difficult. The trial court faulted the Vockroths for their conduct, which it found inappropriate.

On August 28, within days after that argument, the Vockroths filed a complaint in the Circuit Court for Harford County for immediate custody of Kimberly and other ancillary relief. After an *ex parte* proceeding, apparently without notice to petitioner, the court granted them temporary custody and set a hearing on the matter. Petitioner then filed a similar action in Michigan and contested the jurisdiction of the Maryland Circuit Court. At a hearing on October 5, 1998, the

Circuit Court struck its *ex parte* order upon an agreement that, pending resolution of the jurisdictional issue, Kimberly would remain with the Vockroths. After a conference with the Michigan court, the Circuit Court assumed jurisdiction, and petitioner filed a counter-complaint for custody in that action. A guardian was appointed for Kimberly.

As noted, the court heard seven days of testimony, and it received many documents. Among the documents received was a report from the Oakland County [Michigan] Friend of the Court, apparently an official or semi-official advisor to the Michigan Circuit Court, regarding visitation issues that arose in connection with the 1991 divorce. The Report noted that petitioner did not even see Kimberly until she was a year old, that he "has had little regular and consistent involvement in the child's life," and that based on *petitioner's* assertions, it was reasonable to assume that "the child has very little bonding with the father." It concluded that "[t]he burden is on the father to establish a meaningful relationship with the child before separating her from her mother."

The court also received an evaluation from its own Office of Family Court Services. That report summarized the family history and the various allegations of the parties, but most telling was the social worker's summary of his conversation with Kimberly, which he found to be honest and reliable. When asked about "life in general," she said that the Vockroths "treat me like a daughter," that "[t]hey fix my meals—make sure I do my homework. They have raised me. They do a lot for me—take me places—buy things for Christmas—they make sure things are good. They are my version of what it means to be good parents." In contrast, she said of petitioner that he "does not know things that I like—he's never bothered with me for 11 years—he really doesn't know what I like. I really don't know him, he keeps to himself. I can't love him if I don't know him." The author concluded that the 1990 Friend of the Court Report remained the standard for the behavior that petitioner needed to demonstrate toward his daughter. The judge, himself, interviewed Kimberly in chambers, and she expressed similar sentiments.

She said that she had been with the Vockroths all her life and that they "are like my second mom and dad." She told the court, "Well, I want to stay here, but he wants me to go out there, and I don't know him ... I hardly ever see him, and all of a sudden he wants to be dad, and I don't know, I rather stay here because this is my home. I lived here all my life. That's my grandparents['] house was the only house that I really ever known to be a home."

Upon all of the evidence, including that favorable to petitioner, the court concluded that Kimberly should remain with the Vockroths. It acknowledged that, in a dispute between a parent and a non-parent, there is a presumption that the best interest of the child is served by placing the child with the parent and that the presumption could be rebutted only if (1) the parent is unfit, or (2) exceptional circumstances existed so that custody with the parent would not be in the child's best interest. It found no evidence that petitioner was unfit. In examining whether there were exceptional circumstances that would make awarding custody to petitioner detrimental to Kimberly's best interest, the court discussed and made findings with respect to the various factors that we mentioned in *Ross v. Hoffman* as being of probative value:

> "[T]he length of time the child has been away from the biological parent, the age of the child when care was assumed by the third party, the possible emotional effect on the child of a change of custody, the period of time which elapsed before the parent sought to reclaim the child, the nature and strength of the ties between the child and the third party custodian, the intensity and genuineness of the parent's desire to have the child, the stability and certainty as to the child's future in the custody of the parent."

*Ross v. Hoffman, supra,* 280 Md. at 191, 372 A.2d at 593.

As to the first factor, the court noted that petitioner resided with Kimberly for only nine months in 1989–90 and that his contacts with her since then had been minimal. The court was critical of petitioner for not including Kimberly more in his life and not making greater efforts to visit with her. It concluded

that, in petitioner's "mindset," Kimberly was "distant," that she was "not a real part of his life" and "was not family." On the second factor, the court observed that, although Kimberly was nearly eleven when the Vockroths assumed full care of her following Pamela's death, they had been very active in her life since she was born and had acted "like back-up parents." Addressing the third and fourth factors, the court noted that, petitioner made no effort to seek custody while Pamela was alive and, indeed, "shouldered no responsibilities for Kim, except for his paying child support," but that he did act promptly upon Pamela's death. His current desire to have custody, the court said, was genuine and intense.

On the next two factors—the nature and strength of ties between Kimberly and the Vockroths and the possible emotional effect on Kimberly if custody was changed—the court found that Kimberly was emotionally tied to the Vockroths. It concluded that Mr. Vockroth and Mr. Hall had been the father figures in her life and that she remained close to her two cousins (the children of Pamela's brother) and to Hall's two daughters. The court largely dismissed the concerns expressed by petitioner, Maria, and a Michigan psychologist retained by petitioner regarding Kimberly's emotional status and noted that, if custody were given to petitioner, on top of the loss of her mother, with whom she had been very close, Kimberly would lose "all anchors of stability, her friends, all of her relatives, her parent figures, her school environment." Keying on evidence of encounters and her behavior and feelings during her visit to Michigan, the court pointed out that she would be going to a totally new environment "into a family unit that is just forming where she doesn't know the father, the sister, or the stepmother figure, where she is viewed with suspicion, where she has been accused, in essence, of lying, of being sneaky, where they don't trust her around her sister [petitioner's child with Maria], where the sister is the apple of dad's eye, and where Maria did not come across as very warm towards Kim, and frankly, [petitioner] himself never expressed his love for Kim from the stand." In the Vockroth's home, by

way of contrast, Kimberly "is very much of a success story and viewed very positively."

Turning to the last of the enumerated factors—certainty and stability if custody was given to petitioner—the court noted that the Vockroths were in their late 60's, that they had done little to encourage contact between Kimberly and her father, and that they may not recognize Kimberly's need for counseling, but it observed also that, although stable and secure financially and more sensitive to the child's need for counseling, petitioner had never really been a parent to her. He is, the court said, "an untried entity, and to date his actions indicate his own lack of competence being a parent or his indifference to it." The court observed that he was making less than a real effort to solidify his relationship with Maria, with whom he had put off marriage, and concluded that he "does not present as much of a model for family values, love or commitment, and the Court questions if that is going to change."

Considering all of those factors, the court determined that "it is in the best interest of Kimberly to keep her here in Maryland with the [Vockroths]." Because it believed that, if directed to do so, the parties would be able to work together, the court ordered joint legal custody in petitioner and the Vockroths, primary residence with the Vockroths, and liberal visitation for petitioner in accordance with a schedule enunciated by the court. The court added that it would retain jurisdiction to modify that arrangement if the Vockroths failed to work with petitioner to foster a parent-child relationship or if petitioner failed to follow through with his obligations.

Petitioner appealed that judgment to the Court of Special Appeals which, in an unreported opinion, affirmed. The intermediate appellate court concluded that (1) to rebut the presumption in favor of parental custody, it was sufficient to prove parental unfitness or exceptional circumstances that would make parental custody detrimental to the child's best interest by a preponderance of evidence, (2) the trial court applied the *Ross v. Hoffman* standards correctly, and (3) the

trial court did not abuse its discretion in awarding joint legal custody with residential custody in the Vockroths.

## DISCUSSION

### Standard of Proof

From cases involving the termination of parental rights (TPR), through either adoption or guardianship proceedings, petitioner draws and asserts the principle that a parent has a fundamental liberty interest, protected by the Fourteenth Amendment to the Constitution, to raise his or her children and that any justification for depriving a parent of that right must be supported by clear and convincing evidence. He treats a custody battle between a parent and a non-parent in the same manner as a TPR proceeding, as placing in jeopardy the parent's right to raise the child, and thus insists that the same standard of clear and convincing evidence should apply if the *Ross v. Hoffman* presumption favoring the parent is to be found rebutted and custody is to be awarded to the non-parent. The trial court, he urges, failed to apply that standard but instead acted only upon a preponderance of the evidence. To the extent the Maryland law allows such a decision to be founded upon a mere preponderance of evidence, he claims, that law deprives the parent of due process of law and is therefore invalid.

As a preliminary matter, we note our inability to find anywhere in the record that petitioner raised this issue in the Circuit Court. Nothing was said about the standard of proof to be applied, either by the parties or by the court. It may well be that, in making his findings and ultimate decision, the judge *did* apply a preponderance standard, but there is no evidence that he did or that he was asked to apply any other standard. Nonetheless, because the Court of Special Appeals addressed the issue, we shall address it as well.

The nature of petitioner's argument has been noted. In the context of attempts to terminate all of a natural parent's parental rights, through proceedings for adoption or guardianship with the right to consent to adoption, the Supreme Court

has made clear that those rights are fundamental ones that have Constitutional protection and that they may be abrogated only when a paramount need to do so is established by clear and convincing evidence.

The Supreme Court has long recognized the right of a parent to raise his or her children as a fundamental one protected by the due process clause of the Fourteenth Amendment. *See* cases beginning with *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), extending, among other intermediate cases, through *Prince v. Massachusetts,* 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944), *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), and *Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), to, most recently, *Troxel v. Granville,* 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). We have echoed that principle as well, on many occasions.

The one Supreme Court case actually touching on the standard of proof required when the State seeks to deprive a parent of that right was *Santosky v. Kramer, supra,* and that case bears some examination. Before the Court was a New York TPR statute that authorized the State to terminate all parental rights and free a child for adoption upon proof, by a preponderance of the evidence, that the child had been permanently neglected. The judgment in such a case, the Court noted, "denies the natural parents physical custody, as well as the rights ever to visit, communicate with, or regain custody of the child." *Santosky,* 455 U.S. at 749, 102 S.Ct. at 1392, 71 L.Ed.2d at 603. Whether due process requires the factual predicate for such a judgment to be established by more than a mere preponderance of the evidence depended, the Court held, on a balancing of the three factors set forth in *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)— the private interests affected by the proceeding, the risk of error created by the State's chosen procedure, and the countervailing governmental interest supporting use of the challenged procedure.

The focus of that balancing was on the function of a standard of proof, which the Court defined as the degree of confidence society believes a fact finder should have in the correctness of factual conclusions that the fact-finder draws in a particular kind of adjudication. *Santosky*, at 754–55, 102 S.Ct. at 1395, 71 L.Ed.2d at 607 (quoting *Addington v. Texas*, 441 U.S. 418, 423, 99 S.Ct. 1804, 1808, 60 L.Ed.2d 323, 329 (1979)) and *In re Winship*, 397 U.S. 358, 370, 90 S.Ct. 1068, 1076, 25 L.Ed.2d 368, 379 (1970) (Harlan, J., concurring). The preponderance of evidence standard, the Court noted, indicates society's "minimal concern with the outcome" and a conclusion that the litigants should "share the risk of error in roughly equal fashion." *Santosky*, 455 U.S. at 755, 102 S.Ct. at 1395, 71 L.Ed.2d at 607 (quoting *Addington, supra*, at 423, 99 S.Ct. at 1808, 60 L.Ed.2d at 329). On the other end of the spectrum was proof beyond a reasonable doubt, applicable in criminal cases where, because of the magnitude of the private interest, that interest must be protected by a standard of proof "designed to exclude as nearly as possible the likelihood of an erroneous judgment." *Id.* (quoting *Addington v. Texas, supra* ). The intermediate standard of clear and convincing evidence is mandated "when the individual interests at stake in a state proceeding are both 'particularly important' and 'more substantial than mere loss of money.'" *Santosky*, 455 U.S. at 756, 102 S.Ct. at 1396, 71 L.Ed.2d at 608 (quoting *Addington, supra* ).

Turning to the three *Mathews v. Eldridge* factors, the Court held the private interest affected by a TPR proceeding to be a "commanding" one. *Id.* at 758, 102 S.Ct. at 1397, 71 L.Ed.2d at 609. It explained that, in such a proceeding, the State is the adversary actor and seeks not merely to infringe the parent's fundamental liberty interest in raising his or her child but to end it, noting that if the State prevails in a TPR case, "it will have worked a unique kind of deprivation." *Id.* at 759, 102 S.Ct. at 1397, 71 L.Ed.2d at 610 (quoting *Lassiter v. Department of Social Services*, 452 U.S. 18, 27, 101 S.Ct. 2153, 2160, 68 L.Ed.2d 640, 650 (1981)). That first factor, therefore, "weigh[ed] heavily against use of the preponderance standard

at a state-initiated permanent neglect proceeding." *Santosky,* 455 U.S. at 759, 102 S.Ct. at 1398, 71 L.Ed.2d at 610. The fact-finding aspect of such a proceeding, the Court emphasized, was not intended to balance the child's interest in a normal family home against the parent's interest in raising the child, but rather "pits the State directly against the parents" in a proceeding in which "[t]he State marshals an array of public resources to prove its case and disprove the parents' case." *Id.* at 759–60, 102 S.Ct. at 1398, 71 L.Ed.2d at 610.

In examining the risk of an erroneous deprivation of private interests—the second *Mathews* factor—the Court regarded the fact-finding stage of a State-initiated TPR proceeding as "bear[ing] many of the indicia of a criminal trial." *Id.* at 762, 102 S.Ct. at 1399, 71 L.Ed.2d at 612. The issues to be resolved employ imprecise substantive standards and leave a great deal of discretion to the judge and, given that many parents subject to TPR proceedings are poor and uneducated, "[t]he State's ability to assemble its case almost inevitably dwarfs the parents' ability to mount a defense." *Id.* at 763, 102 S.Ct. at 1400, 71 L.Ed.2d at 613. The primary witnesses will be the agency's own professional caseworkers, whom the State has employed to investigate the family and testify against the parents, and, because the child is already in State custody, the State has the power to shape the historical events that form the basis for termination. Those factors, and others, the Court held, when coupled with a preponderance standard, "create a significant prospect of erroneous termination." *Id.* at 764, 102 S.Ct. at 1400, 71 L.Ed.2d at 613.

The Court viewed the State's interest in maintaining the preponderance standard—the third *Mathews* factor—as a dual one of providing the child with a permanent home and reducing the cost of a TPR proceeding, but it concluded that both were consistent with a clear and convincing evidence standard. *Id.* at 766, 102 S.Ct. at 1401, 71 L.Ed.2d at 615. The State's *parens patriae* interest, it said, favored preservation, rather than severance, of parental ties, and that goal was served by procedures that promote an accurate determination of whether the natural parents can provide a normal home. As to

administrative burden, the Court noted that 35 States (including Maryland) then employed a higher standard than preponderance in TPR cases, and it doubted that such a higher standard would create any real administrative problems. *Id.* at 767, 102 S.Ct. at 1402, 71 L.Ed.2d at 615.

Upon these various conclusions, the Court held that, at a TPR proceeding, the near-equal allocation of risk between the parties afforded by the preponderance standard was Constitutionally impermissible, that, although not Constitutionally required, the States were free to adopt a reasonable doubt standard if they chose to do so, but that the clear and convincing evidence standard adequately conveyed to the factfinder the level of certainty necessary to satisfy due process. *Id.* at 768–69, 102 S.Ct. at 1402–03, 71 L.Ed.2d at 616–17.

There are, of course, a number of important differences between, on the one hand, the State seeking to terminate permanently a parent's entire spectrum of rights—the right to participate in the raising and education of the child, the right to continue to inculcate the parent's values and help shape the character of the child, the reciprocal rights of inheritance, the right to see, visit, or communicate with the child, or even possibly to know of his or her whereabouts—and, on the other, a dispute between two private individuals over who should have custody of the child during his or her minority, subject to modification by the court upon a proper showing of changed circumstances.

Apart from the temporal difference—a permanent, ordinarily unmodifiable deprivation as opposed to a temporary, modifiable one—the scope and depth of those differences may depend, in part, on the nature of the "custody" at issue. As we pointed out in *Taylor v. Taylor,* 306 Md. 290, 296, 508 A.2d 964, 967 (1986), two very different concepts are embraced within the meaning of the word—"legal custody," which connotes "the right and obligation to make long range decisions involving education, religious training, discipline, medical care, and other matters of major significance concerning the child's life and welfare," and "physical custody," which refers to the

"right and obligation to provide a home for the child and to make the day-to-day decisions required during the time the child is actually with the parent having such custody."[2] Even when both aspects of custody are placed solely with one person, the non-custodial parent does not ordinarily lose the right, even during that custodial period, to visit and have the child with him or her at convenient times, to communicate with the child, to keep abreast of the child's life and activities and to observe or participate in them, or to influence the child's development, and the parent and child certainly do not lose the right of reciprocal inheritance. *See Boswell v. Boswell,* 352 Md. 204, 721 A.2d 662 (1998). The question, of course, is whether those differences, when coupled with the substantive requirements necessary under *Ross v. Hoffman* to rebut the presumption favoring the parent, suffice to create a different balance in the *Mathews v. Eldridge* factors that would make a preponderance standard permissible in a custody battle between a parent and a non-parent.

There does not seem to be any clearly predominant rule in this regard. Most, if not all, States have created a presumption in parent/third party custody disputes in favor of the parent—a presumption that must be overcome by the third party in order to win custody. Unfortunately, the articulation of both the presumption and the circumstances that must be shown in order to overcome it differ somewhat from State to State. When a custodial parent dies and a dispute arises between the surviving parent and a third party, some States

---

**2.** The term "custody" has long been used, almost universally, to embrace both aspects, often without any articulation, or clear recognition, of the difference between them, and it has thus tended to assume, in the minds of some, almost a proprietary or possessory patina, suggesting and sometimes being touted as an exclusive right to possess and control the child and direct his or her destiny. When viewed in that manner, the term can distract the parties—usually the child's parents—from what is really at stake: how responsibility for both the general upbringing of the child and for meeting the child's immediate day-to-day needs should be shared and allocated for the child's best benefit. Perhaps we should begin to express this allocation in a more neutral and descriptive fashion, one that focuses on the parties' responsibilities rather than on their control or possession of the child.

apparently give immediate custody to the surviving parent. *See In re Guardianship of K.M.*, 280 Mont. 256, 929 P.2d 870 (1996); *Walker v. Arnall*, 970 P.2d 625 (Okla.Civ.App.1998); *In re Abelsen*, 190 Or. 319, 225 P.2d 768 (1950). Others in that situation, or one where a parent seeks custody after having either abandoned the child or acquiesced in someone else having custody, use a guardianship proceeding to determine legal and physical custody. *See Roydes v. Cappy*, 762 N.E.2d 1268 (Ind.App.2002); *Fisher v. Fisher*, 99 Nev. 762, 670 P.2d 572 (1983). In some of those States, the guardianship order is treated more like a TPR order than a normal custody determination. *See Watkins v. Nelson*, 163 N.J. 235, 748 A.2d 558 (N.J.2000); *Clark v. Wade*, 273 Ga. 587, 544 S.E.2d 99 (2001).

To some extent, these differences may account for some of the language used by the courts in describing the standard of proof applicable in those cases. Maryland law is somewhat ambiguous. On the one hand, Maryland Code, § 5–203(a)(2) of the Family Law Article, provides that a parent is the sole *natural* guardian of his or her minor child if the other parent dies, abandons the family, or is incapable of acting as parent. On the other, we have not viewed custody disputes between a surviving parent and a third party as in the nature of legal guardianship proceedings, but, subject to the *Ross v. Hoffman* analysis, as like any other custody case.

Some States, as petitioner notes, have, indeed, adopted a clear and convincing evidence standard in parent/third party custody cases (or in cases that the court found equivalent to a custody dispute). *See Murphy v. Markham–Crawford*, 665 So.2d 1093 (Fla.App.1995); *S.G. v. C.S.G.*, 726 So.2d 806 (Fla.App.1999); *Clark v. Wade*, 273 Ga. 587, 544 S.E.2d 99, 108 (2001); *In Re Guardianship of B.H.*, 770 N.E.2d 283 (Ind. 2002); *Greer v. Alexander*, 248 Mich.App. 259, 639 N.W.2d 39 (2001). Other States have adopted that standard in cases that, under the law of those States, are treated more like TPR proceedings than pure custody disputes (*Guardianship of Stephen G.*, 40 Cal.App.4th 1418, 1426, 47 Cal.Rptr.2d 409 (1995)), or upon rationales that are inconsistent with the

Maryland experience and approach. *See Watkins v. Nelson,* 163 N.J. 235, 748 A.2d 558 (2000) (requiring the third party seeking custody to show circumstances that would justify terminating the parent's parental rights and treating custody in the third party as effectively terminating those rights). A few States have expressly adopted a preponderance standard for parent/third party custody cases. *See Larkin v. Pridgett,* 241 Ark. 193, 407 S.W.2d 374 (1966); *Greening v. Newman,* 6 Ark.App. 261, 640 S.W.2d 463 (1982); *In re Perales,* 52 Ohio St.2d 89, 369 N.E.2d 1047 (1977). Some have articulated other tests—"satisfactory evidence" (*In re Dependency of Terry Klugman,* 256 Minn. 113, 97 N.W.2d 425 (1959)) or "evidence evincing" (*In re Custody of N.A.K.,* 649 N.W.2d 166 (Minn. 2002)); "showing clearly" (*Kees v. Fallen,* 207 So.2d 92 (Miss. 1968)); "clear and conclusive" (*McDonald v. Wrigley,* 870 P.2d 777 (Okla.1994)); "cogent and convincing" (*Bailes v. Sours,* 231 Va.96, 340 S.E.2d 824 (1986)). Most States, it appears, have not defined any particular standard of proof but have sought to protect parental rights through the heavy substantive burden placed on the third party—to show unfitness, or "compelling" or "cogent" reasons (*In re Custody of Townsend,* 86 Ill.2d 502, 56 Ill.Dec. 685, 427 N.E.2d 1231 (1981)), or "convincing reasons" (*see Ellerbe v. Hooks,* 490 Pa. 363, 416 A.2d 512 (1980); *Albright v. Commonwealth ex rel. Fetters,* 491 Pa. 320, 421 A.2d 157 (1980)) or, as in *Watkins v. Nelson, supra,* circumstances that would justify termination of parental rights.

We are aware of no case in which a State Supreme Court has concluded that the clear and convincing evidence standard is required in pure custody disputes between a parent and third party as a matter of Constitutional law. Those that have chosen to adopt that standard seem to have done so either as a matter of their own jurisprudence or because the effect of the decree, especially one of guardianship, was treated under that State's law as akin to an effective termination of parental rights.

We do not regard an order granting custody of a child to a third party, subject to modification and with appropriate visi-

tation privileges reserved to the parent, as the equivalent of terminating parental rights or as having the incidents or effects found important in *Santosky v. Kramer, supra,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599. It does not deny the parent the right to visit, communicate with, or ever regain custody; it does not terminate the parent's liberty interest in raising his or her child; it is not a "unique kind of deprivation"; it does not "pit[ ] the State directly against the parents" and does not bear any of the "indicia of a criminal trial." The parents are not necessarily economically or intellectually disadvantaged parties left to face the vast array of State resources; indeed, except for supplying a neutral arbiter in the form of the equity court, the State is usually not involved in the dispute.

We regard TPR proceedings as unique—different in kind and not just in degree—and that has a heavy bearing on how the *Mathews v. Eldridge* factors should be balanced and applied.[3] As noted, a custody case is not one in which there is a singular private interest being attacked by the State, in its capacity as *parens patriae;* there are, instead, two private interests that need to be considered—that of the parent and that of the child. Under *Ross v. Hoffman,* the ultimate standard remains the best interest of the child, and, although, to some extent, the presumption that the child's best interest is served by parental custody suggests a confluence or consistency between those two private interests, custody proceedings often disclose a real divergence between them.

The circumstances that must be shown in order to rebut the presumption, especially when coupled with the various factors that the court must consider in determining the existence of

---

**3.** Even in CINA cases, where a juvenile court is empowered to assume custody of a child, remove the child from his or her home, and place the child with either a public agency or another individual, the standard of proof is preponderance of the evidence. *See* Maryland Rule 11–114c.3 (at adjudicatory hearing, petition alleging delinquency or contributing to status of the child must be proved beyond reasonable doubt; all other allegations of a juvenile petition, including petition alleging CINA, must be proved by preponderance of the evidence).

those circumstances, suggests that the issue in parent/third party custody cases may be, and often is, the immediate safety and short-term welfare of the child, not necessarily his or her long-term immutable best interest. The modifiability of custody orders based on a change in circumstances tacitly recognizes that premise. Many of those cases reveal a situation in which the child's best interest lies in maintaining the parental relationship but having a third party assume responsibility for the child's immediate and short-term needs. *Ross v. Hoffman,* itself, was such a case; the circumstances there, while justifying custody in the third party, would never have warranted a termination of the mother's parental rights. The Legislature has recognized the different role that custody plays in this regard. Section 9–101 of the Family Law Article requires that, in any custody proceeding in which the court has reasonable grounds to believe that a child has been abused or neglected by a party to the proceeding, the court must deny custody to that party, even a parent, unless it finds that there is no likelihood of further abuse or neglect. In that setting too, the child's actual safety may require custody in a third party, even if his or her best interest lies in maintaining the parental relationship. *See In re Adoption No. 12612,* 353 Md. 209, 725 A.2d 1037 (1999).

The heavy substantive burden that must be met in order to rebut the presumption favoring parental custody protects quite well the parent's private interest, but if the standard of proof for rebutting that presumption is too high, it may well be the child who will suffer. When that central fact is considered in light of the much lesser intrusion on parental rights of a modifiable custody order than a permanent TPR order, the private interest of the parent becomes far less "commanding" than that which exists in TPR cases.

Consideration of the child's immediate interest, coupled with the more equivalent power balance between the competing applicants and the modifiability of a custody order upon a showing of changed circumstances, affect the second *Mathews* factor as well—the risk of error. In looking at that factor, the

*Santosky* Court was concerned about both the dramatic and permanent effect of a TPR order on the parent and the increased prospect of an erroneous ruling arising from the power imbalance in the proceeding itself between the State, as prosecutor, and the parent. Neither is ordinarily a factor in a custody proceeding. As already explained, the custody order is not permanent and does not even suspend many important aspects of the parental relationship; nor is there necessarily any power imbalance between the parties that might serve to increase the risk of error.

As we have explained, the State ordinarily has no direct interest in the outcome of any particular custody case. It has a general interest, of course, in the welfare of the children living within its borders but, in the context of custody disputes, is usually content to allow that interest to be gratified through the normal litigation process, which increasingly incorporates mediation. The State does have an interest in preserving the normal standard of proof applicable in civil actions, however.

As a common law State, Maryland has adopted preponderance of the evidence as the standard of proof generally applicable in civil actions, unless some higher standard is either clearly required by Constitutional considerations, is mandated by statute or rule of court, or is firmly established by common law principles. Notwithstanding the Supreme Court's suggestion in *Santosky* that a clear and convincing standard is required whenever the State proceeding is "particularly important" and "more substantial than mere loss of money," neither Maryland nor, we think, other States have taken that notion literally. There are many kinds of civil actions, especially equitable ones, that are both "particularly important" and involve more than "mere loss of money" in which preponderance of the evidence remains the standard of proof. Judgments entered in actions for injunctive relief or for specific performance, for divorce or annulment, to establish or foreclose liens, testing the Constitutional authority of Government to take or regulate property or to control economic activity, and for declaratory relief of one kind or another may

be very important, involve more than money, and yet be based on findings made on a preponderance of evidence. From the points of view of judicial efficiency and simplicity and certainty in the law, the State has an interest in not having civil proceedings unnecessarily balkanized with differing standards of proof. Obviously, that interest must yield when outweighed by countervailing imperatives, but it is a substantial and cognizable interest.

On these considerations, we conclude that a clear and convincing evidence standard is neither Constitutionally required nor appropriate in custody disputes under a *Ross v. Hoffman* analysis.

### *Application of Ross v. Hoffman*

In announcing his findings from the bench, the judge noted the presumption in favor of petitioner and stated that the presumption could be rebutted "through exceptional circumstances existing so that custody with the natural parent would not be in the best interest of the child." No objection was made to that statement, but petitioner now complains that it constituted a misapplication of the ruling announced in *Ross v. Hoffman*. What needs to be shown, he argues, is that parental custody would be "detrimental to the best interest of the child," not that parental custody would not be in the child's best interest.

The court's oral opinion in this case consumed 36 pages of transcript. The judge was obviously aware of *Ross v. Hoffman* and its progeny, as he carefully articulated and discussed the various specific considerations we enunciated in those cases. It seems clear to us from the ruling as a whole that he applied the correct standard, and we have no doubt that, had petitioner called his attention to the one passage in contention, he would have restated it in the proper way. All of the findings that, in his view, militated against forcing Kimberly to leave her home, the people she regarded as her effective parents, and her whole support system and live in Michigan with a father and family she hardly knew, sufficed to show, and were no doubt intended to declare, that custody in peti-

tioner would, indeed, have been detrimental to her best interest. We find no misapplication.[4]

### Restatement of Ross v. Hoffman

Petitioner points out one aspect of *Ross v. Hoffman* that *is* confusing and needs clarification. After discussing earlier cases, we stated, as noted earlier in this Opinion:

> "To recapitulate: the best interest of the child standard is always determinative in child custody disputes. When the dispute is between a biological parent and a third party, it is presumed that the child's best interest is [served] by custody in the parent. That presumption is overcome and such custody will be denied if (a) the parent is unfit to have custody, or (b) if there are such exceptional circumstances as make such custody detrimental to the best interest of the child."

*Ross v. Hoffman, supra,* 280 Md. at 178–79, 372 A.2d at 587.

We should have stopped there. Instead, we continued, in the very next sentence:

> "Therefore, in parent-third party disputes over custody, it is only upon a determination by the equity court that the parent is unfit or that there are exceptional circumstances which make custody in the parent detrimental to the best interest of the child, that the court need inquire into the best interest of the child in order to make a proper custodial disposition."

*Id.* at 179, 372 A.2d at 587.

Having first announced that the best interest of the child "is always determinative in child custody disputes," we did muddy the waters a bit by stating that, unless the trial court finds unfitness or exceptional circumstances that would make custo-

---

**4.** As part of his argument on this point, petitioner takes issue with some of the court's findings. It will suffice for us to say that we have considered his argument and conclude that there was substantial evidence to support each of the factual findings and that, in reaching its ultimate conclusion, the court did not abuse its discretion. *See Davis v. Davis,* 280 Md. 119, 372 A.2d 231 (1977).

dy in the parent detrimental to the child's best interest, it need not "inquire into the best interest of the child in order to make a proper custodial disposition." The court must always, necessarily, inquire into what is in the child's best interest, for that is the ultimate, determinative factor.

The real point made in *Ross v. Hoffman* and carried forth since is that, when the dispute is between a parent and a third party, it is presumed that the child's best interest lies with parental custody. If there is a sufficient showing that the parent is unfit, however, or that exceptional circumstances exist which would make parental custody detrimental to the child's best interest, the presumption is rebutted and custody should not be given to the parent, for, in either situation, parental custody could not possibly be in the child's best interest. So long as the best interest of the child remains the definitive standard and there is any reasonable alternative, it defies both logic and common sense to place a child in the custody of anyone, including a parent, when either that person is unfit to have custody or such action, because of exceptional circumstances, would be detrimental to the child's best interest. What *Ross* teaches is that (1) the best interest standard applies and prevails, and (2) that standard is gratified by giving custody to the parent when the presumption has not been rebutted and by denying custody to the parent when it *has* been rebutted. The last sentence that we quoted from that case was simply intended to make clear that, because of the presumption, a parent and a third party do not stand on an equal footing, and that, before the third party may be granted custody, he or she must rebut the presumption in one of the manners indicated.

As we do not believe that the trial court was in any way confused about the proper standard to apply, and as we have found that it applied that standard properly, we shall affirm.

JUDGMENT OF COURT OF SPECIAL APPEALS AFFIRMED, WITH COSTS.

Judge CATHELL concurs in the result only.