18 A.3d 40

**In re SHIRLEY B., Jordan B., Davon B., and Cedric B.**

**No. 61, Sept. Term, 2010.**

Court of Appeals of Maryland.

April 25, 2011.

Matthew H. Fogelson, Asst. Public Defender (Paul B. De-Wolfe, Public Defender, Baltimore, MD), on brief, for petitioners.

Ann M. Sheridan, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief for respondents.

Shondriette D. Kelley (Legal Aid Bureau, Inc., Riverdale, MD), on brief, for respondents.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS, BARBERA, JJ.

ADKINS, J.

This tragic case once again requires us to balance a parent's rights to raise her children against the State's interest in protecting those children from neglect or abuse. Two factors make this case uncommonly hard—(1) the lack of progress towards parent-child reunification despite significant efforts by the Department of Social Services *combined* with cooperation from the parent, and (2) the apparent impact of our governmental financial downturn on the availability of services for those who are developmentally disabled.

Petitioner, Ms. B., and Mr. T.[1] are the biological parents of Shirley B., Davon B., Jordan B., and Cedric B. (collectively "the Children").[2] In 2005, the Children were referred to the

---

1. Mr. T. did not participate in this appeal.

2. Ms. B.'s older son, Dion, is not part of this appeal.

Prince George's County Department of Social Services (the "Department") following reports of neglect and sexual abuse. A subsequent psychological evaluation revealed that Ms. B. was cognitively impaired, and it was observed that the Children had special needs of their own. Perhaps due to her cognitive limitations, Ms. B. was largely unresponsive to the Department's assistance and she allowed vital benefits to lapse. She also permitted unauthorized adults to move into her home and exposed the Children to drug use and sexual activity. Finally, a violent altercation between Ms. B., Mr. T., and Shirley prompted the Department to remove the Children from Ms. B.'s care.

As the Children sat in foster care, the Department continued to offer services to Ms. B. in the hopes that she would be able to develop the parenting skills necessary for reunification with her Children. In addition to general parenting classes, the Department attempted to connect Ms. B. with services specifically tailored to meet her special needs through various State agencies and outside institutions. Yet, due to economic constraints, funding for these services was non-existent, leaving Ms. B. ineligible to receive them. The Department remained determined, however, and it continued to search in vain for other sources of funding or funded services.

By the Children's 2009 permanency plan hearing, the funding and services had not materialized. At this time, the Children had been in foster care for 28 months, and there was no end in sight. The Children's case worker believed that it was not in the Children's best interests to be returned to Ms. B., and was unsure whether they could ever be safe in Ms. B.'s care. At the hearing's conclusion, the juvenile court, concerned with the Children's welfare and need for stability, changed the goal of the Children's permanency plans from reunification to adoption. The Court of Special Appeals affirmed that decision, and Ms. B. appealed to this Court so that we might consider the following questions:

(1) Does the Department of Social Services satisfy the statutory requirement that it must make reasonable efforts to finalize the permanency plan of reunification where a

parent was referred to services pertaining to specific impediments to reunification, but never received those services due to lack of funding?

(2) Where Petitioner had concededly followed through with the Department's referrals to services identified by the juvenile court as "critical" for efforts at reunification with her children, but did not receive those services solely because of a lack of funding, did the Department satisfy its statutory obligation to make reasonable efforts toward reunification?

(3) Did the juvenile court abuse its discretion when it changed the permanency plans for the four children from reunification to adoption?

We shall hold that the "reasonable efforts" requirement is case-specific, and must be considered in light of the services at the Department's disposal. Here, the juvenile court did not clearly err when it found that the Department had diligently pursued available avenues to reunification. Furthermore, Ms. B.'s limitations prevented her from providing a safe home for her children in the foreseeable future; thus, the juvenile court did not abuse its discretion when it determined that changing the Children's permanency plans was in their best interests.

## FACTS AND LEGAL PROCEEDINGS

### A. CINA Determinations

The four children in this case were referred to the Department in June 2005 following allegations of neglect. At that time, there was no food in the home, the children were dirty, and the school-aged children were not attending school regularly. The Department also had to remove Ms. B's older son, Dion, from the home following concerns that he had sexually assaulted his younger siblings. It assisted Ms. B and the Children in moving to an emergency shelter placement, and provided them with Family Preservation Services.

Thereafter, the Department provided several types of assistance to Ms. B and the Children, including:

- securing and moving mother and children into transitional housing,
- providing furniture for the home,
- securing food stamps and providing emergency food services even after food stamps were awarded,
- transporting mother to medical appointments,
- providing in-home parenting instruction,
- referring Ms. B for vocational training at the Department of Rehabilitative Services ("DORS"), and
- arranging individual and family counseling.

The Department also arranged and paid for a psychological evaluation of Ms. B. That evaluation was conducted by Dr. Sybil Smith–Gray, who determined that Ms. B's "cognitive functioning indicates her problem solving abilities to be in the mildly retarded range[.]" Smith–Gray observed that these limitations resulted in an "affect driven" problem-solving approach, meaning that Ms. B. relies "heavily upon her feelings in arriving at conclusions and making decisions about any given situation because she has difficulty in carefully thinking through possible solutions." Smith–Gray opined that Ms. B.'s "cognitive limitations are capable of impinging upon her ability to sustain adequate care for her children over time without external support and intervention."

According to the Department, Ms. B was "largely unresponsive" to its initial efforts. She never attended DORS or counseling, and she let her Temporary Cash Assistance ("TCA") benefits lapse. She also allowed unauthorized adults to move into her home and exposed the Children to drug use and sexual activity. The Children's school reported that the Children would attend class

> with an obscene body odor, dirty clothes, and roaches crawling out of their book bags.... [Jordan and Davon's] behavior was out of control with their peers. All of the children appear to have speech impairments that Ms. B. refused to address, as well as taking the children for their annual physicals.

The final straw for the Department came on February 4, 2007, when Ms. B.'s oldest daughter, Shirley, attempted to use a knife to intervene in a fight between her mother and Mr. T. For the Children's safety, the Department removed the Children and placed them in emergency shelter care. Two days later, a juvenile court authorized the continuation of shelter care placement.

One month after the Children were removed from their mother, the juvenile court determined that Shirley was a Child in Need of Assistance ("CINA").[3] The court found that the "home [was] chaotic with domestic violence, lack of sexual boundaries and drug use by several people that are there most of the time including her father." Indeed, Shirley admitted that her father and his siblings had used drugs in her presence. Moreover, the court recognized that Ms. B. "is cognitively limited[,]" and the "services DSS recommended [to Ms. B.] were available and in place but not used with the exception of the Section 8 housing voucher." The court later made the same findings with regard to Davon, Jordan, and Cedric, and also designated them as CINA. At this time, the permanency plans for all four children were designed for reunification.

### B. December 2008 Permanency Plan Review Hearing

For approximately the next two years, the Department crafted services for Ms. B. and Mr. T. aimed at reunification. It referred Mr. T. to substance abuse treatment after he admitted to a 20–year crack cocaine habit and his urine tested positive for cocaine at the time the Children were removed from their parent's care. He was also advised to seek counseling for domestic violence. Mr. T., however, "[did] not follow[ ] through" with any of these referrals. Similarly, Ms. B. was

---

**3.** A child in need of assistance ("CINA") is "... a child who requires court intervention because: (1) The child has been abused, has been neglected, has a developmental disability, or has a mental disorder; and (2) The child's parents, guardian, or custodian are unable or unwilling to give proper care and attention to the child and the child's needs." Md.Code (2006 Repl.Vol.), § 3–801(f) of the Courts & Judicial Proceedings Article ("CJP").

offered an intervention program for victims of domestic violence, but she never made herself available for any such meetings despite the program administrator's willingness to work around her schedule.

In June 2008, the parents' lack of progress prompted a juvenile master to recommend that the Children's permanency plans be changed from reunification with Ms. B. to adoption. The master observed that, despite the Department's "reasonable" efforts, Ms. B. "had not made much movement towards reunification[.]" Both parents filed exceptions to this ruling, and on December 2, 2008, the juvenile court held a *de novo* review hearing.

At the hearing, Natalie Gimperling, a Department social worker assigned to the case, testified that all four children were making progress and were receiving the help they needed to encourage their educational and personal development. Regarding Ms. B., Gimperling believed that Ms. B.'s primary barrier to reunification was her cognitive limitations. Gimperling also testified that when she spoke with Mr. T., he informed her that he had been living with the Ms. B "the whole time[,]" a direct violation of an earlier court order that stated he could not be present at any of Ms. B.'s unsupervised visits with the Children.

Despite agreeing with Gimperling's opinion that it was not in the best interests of the Children to return to Ms. B., the juvenile court sustained the exceptions and determined that the goal of the permanency plan should continue as reunification. The court believed that it was "significant that none of the evaluations . . . or the reports absolutely stated that the mother would not be able to parent." The court did find, however, that "the [D]epartment [had], indeed, made reasonable efforts towards achieving reunification" and that Ms. B. "needs specialized parenting classes that are only available through the Developmental Disabilities Administration ["DDA" [4]] or Melwood [5] in light of her diagnosis and the

---

4. The Developmental Disabilities Administration ("DDA") is a branch of Maryland's Department of Health & Mental Hygiene. According to its

special needs of each child." The court also warned that though it supported reunification, its decision did "not necessarily mean that once services [were] provided and [were] in place that the [c]ourt would be satisfied that reunification [was] viable." The juvenile judge simply believed that the "mother need[ed] a chance, and [that time was] not the time to cut off that chance" to reunify.

## C. The Children's Neuropsychological Evaluation

In an effort to aid its permanency planning, the Department engaged clinical neuropsychologist James E. Lewis to evaluate Ms. B. and the Children. In April 2009, Lewis interviewed the Children, who all graphically recalled episodes of violence and inappropriate behavior they had witnessed and the abuse they suffered while residing with Ms. B. and Mr. T. According to Jordan, Mr. T. would

> slap our mommy in the arm and face [and] punch her in the stomach and face, too. He hit our mommy so hard he knocked her down . . . I was scared and I'd hide under the bed. . . . Our dad would hit all of us with his hand or a big fat belt . . . he beat us on our butts and legs with the belt . . . if our mom tried to stop him, he'd hurt her, too . . . he'd drink a lot of beer out of these big cans and then get crazy . . . when he was acting crazy, he would be yelling and cussing and calling everybody names . . . sometimes the police came . . . I think they locked my daddy up once . . . I was glad because he was a bad boy all the time . . . I think he went to jail because he was such a bad boy to all of us.

Davon recalled that Mr. T.'s beatings would "leave big red marks [on the Children] and [that he would tell them] that

website, the DDA "provides a coordinated service delivery system so that individuals with developmental disabilities receive appropriate services oriented toward the goal of integration into the community." Developmental Disabilities Administration, http://dhmh.maryland.gov/dda_md/index.html (last visited March 7, 2011).

**5.** Melwood is an IRC Section 501(c)(3) charitable organization that assists cognitively-challenged individuals. The funding for any of Ms. B's Melwood services would be provided by the DDA.

[they] shouldn't tell at school what he did or he would beat [them] up worse." Lewis reported that Davon, Jordan, and Cedric all suffer from Post Traumatic Stress Disorder ("PTSD").

The troubles at home perhaps fell the most heavily on Shirley, who, at the age of eleven, had assumed the "grossly inappropriate role of mothering her own mother and her younger siblings." Shirley explained that she would "take care of [her] little brothers, like getting them dressed and trying to remind them about their lunches and their books to go to school[,]" and that she would "even take care of our mom[.]" She also described being raped by her older brother, Dion, at her mother's house:

> [H]e'd have me back in this room but he'd have his hand over my mouth ... he'd push his pee pee into my private area ... other times, he'd touch my private area with his hand. I've had really bad dreams and nightmares about all of this ... and I feel bad even saying what happened, because people think it was my mom's fault for not taking better care of us.

Moreover, like her siblings, Shirley was a witness to and a victim of Mr. T.'s violence:

> "[O]ur dad ... hurt our mom really bad ... he'd hit her with his fists and knock her down ... I remember hearing that the police had come ... I think they took him off to jail ... but then our mom would let him come back again and hurt us all over again ... including her."

Following the interview, Lewis concluded that Shirley suffers from Depressive Disorder as well as "a Severe and Unresolved PTSD."

### D. June 2009 Review Hearing

Two months after Dr. Lewis's interviews, the juvenile court held another review hearing. Prior to the hearing, Ms. B. moved to exclude Dr. Lewis's report with regard to her assessment, citing patient-psychologist privilege. The juvenile

court granted the motion, and a redacted copy of the report was received into evidence.

At the hearing, Gimperling testified as the sole witness, and she chronicled the Department's efforts since the previous hearing to rehabilitate Ms. B. so that she could be reunited with the Children. Specifically, Gimperling had been in contact with DORS so that Ms. B. could receive vocational training from Melwood.[6] Yet, "because of the funding circumstances right now between the State and [DORS], they're not referring clients to [Melwood] at this time because [Melwood] does not have the funding to provide them with that vocational training service." Gimperling encountered the same problem when she contacted the DDA, another resource that could fund Ms. B.'s Melwood services. Even though the DDA did accept Ms. B. and placed her on its waiting list for funds, it repeatedly told Gimperling that it was unsure when Ms. B. would be eligible for services.[7] Gimperling also contacted the Community Connections agency "to get some ideas as to [whether there were] other pots of money that could be drawn off of to somehow provide her with services." She learned of a couple thousand dollars in rolling access funds, but by January, those funds had already been exhausted for that funding year. As there was "no money to have any assessments done by either a psychiatrist or a psychologist from DDA, [Gimperling] then made the referral to Dr. Lewis." Gimperling had also been communicating with the Arc of Prince George's County, an organization that offers a support group for parents who have developmental disabilities and who have children with developmental disabilities.

---

**6.** According to Gimperling, Melwood services would be the "most beneficial" for Ms. B.

**7.** The DDA has a four-tiered waiting list for services, based upon an individual's personal needs. Following her assessment, Ms. B. was placed on the second tier. Consequently, she would not be eligible for services until every first-tier candidate had received them, regardless of whether that person was referred to the DDA after Ms. B.

In addition to Gimperling's attempts to connect Ms. B. with services from the DDA, Melwood, and the Arc, the Department assisted Ms. B. with her daily living. After Ms. B. allowed her Medical Assistance lapse, Gimperling helped her to reactivate it. Ms. B. also suffered from high blood pressure and high blood sugar, and she allowed these medical conditions to go untreated. Upon learning of this, a Department case associate took Ms. B. to an urgent medical care facility, which later transferred Ms. B. to the hospital after she complained of chest pains. The case associate stayed with Ms. B. during her entire hospital visit, helped her to get medicine afterwards, and then took her home. The case associate also scheduled Ms. B.'s gynecological and dental exams and transported her to her medical appointments. Moreover, the Department took Ms. B. to and from all of the Children's educational appointments, and caseworkers have "been there with her and helped to try and explain the [C]hildren's educational status." Department workers have also transported Ms. B. "for all of the family visits that occur at the agency."

Later in the hearing, Gimperling recounted her observations of Ms. B.'s interactions with the Children. During the supervised visits, Gimperling would bring in games or prepare an activity for Ms. B. and the Children to complete together, but it was always a challenge to keep each of them focused on the activity at hand. Gimperling also noticed that Ms. B. focused her aggression on Davon. A case associate reported seeing Ms. B. strike Davon on multiple occasions, and Gimperling observed that Ms. B. would keep food from Davon:

> Food is brought in, like candy and different cookies and treats. [Ms. B.] usually primarily starts with Shirley, favoring Shirley first, and then will distribute. And if Davon is wanting to have something somebody else has, rather than letting them maybe [share], she will just immediately say, no, Davon, you can't have it. And if he attempts to then get it, she will hit him, and she yelled at him.

Gimperling instructed Ms. B. on how to handle her children in a stressful situation, but Ms. B. still continued to strike Davon. Regarding the unsupervised visits between Shirley and Ms.

B., Shirley had reported that she would use her own allowance money to purchase groceries for Ms. B.

Gimperling also testified that the children were thriving in their current placements. Shirley had made "extreme progress" in her current foster home and was performing "much better in school" because she has "a very consistent schedule in terms of she knows what to expect on a daily basis." Davon, Jordan, and Cedric were also doing well in their foster placements, and there was potential for those placements to become adoptive resources for them. When asked what efforts the Department could make to reunify the Children with Ms. B. within the next year, Gimperling responded, "I don't know what we could do to make [reunification] a safe situation where all the kids would flourish as they are right now."

At the conclusion of the hearing, the juvenile court changed the permanency plan from reunification to adoption. The court emphasized that it was not reconsidering its decision from the December hearing, but rather making a decision based upon the lack of progress since the time of that hearing. The court found that it was not in the Children's best interests to be reunited with Ms. B. because she had not received the necessary educational training and she did not reside in a home that would accommodate the Children. It recognized that Ms. B. had cooperated with the Department, but it still did not believe that the Children could be safe in her care.

Regarding the Department's efforts, the court explained that the Department's responsibilities did "not include making administrative decisions for other agencies charged with specific responsibilities." The court did not think that it was "appropriate in any of these instances to order the [Department] to finance services that are within the purview of other agencies, such as the [DDA] or [DORS]." Against this backdrop, the court found that, since the December hearing, the Department

> ha[d] done more [with regard to linking Ms. B. with services consistent with her abilities.] The Department is at the mercy of agencies that lack necessary funding to provide

services that are critical to informing this Court as well as the parties as to the process for [Ms. B.] to acquire skills that are necessary to meet the special needs of Cedric, D[a]von, Jordan and Shirley. Those are special educational needs, as well as developmental needs. The [c]ourt finds that mother requires services that will allow her to have assistance that will permit her to attend to those needs. The evidence is that mother requires hands—on assistance of the Department to meet her very own personal needs. And the [c]ourt finds that mother is not able to access or to negotiate the system that's necessary to provide for the safety of the four children, or to attend to their developmental and educational needs.

[W]e don't know how much time it would take for funding to become available to the agencies. We know that now we're 28 months into the life of the children with the Department[.]

The [c]ourt finds that the Department globally—the Department has made reasonable efforts to achieve the plan [for] reunification by referring mother to the [DDA] and [DORS], assisting in her preparation of the application and a submission in achieving placement of mother on a second tier waiting list—a waiting list at the second tier.

The Department has made reasonable efforts by attempting to ... determine when mother may be able to receive services, and those efforts have met with an inability of the agency to give a date when services might be available. The Department's efforts have included determining when mother might be able to be placed with [Melwood], only to find that ... [Melwood] is no longer receiving—taking clients of [DORS].

The Department's reasonable efforts included contacting the Community Connections Agency to determine if other funds were available for the services that were not ... readily accessible through the [DDA] and [DORS]. And funds that might have been available had been exhausted by January of 2009, within a ... relatively short period of time after the parties were before the [c]ourt.

The Department's reasonable efforts included obtaining a necessary neuro-psychological evaluation in an effort to provide an evaluation that would have otherwise been funded by these other sources, albeit the evaluation that this Court did not review. The Department's efforts included obtaining a ... family clinical interview with regard to the children.

The Department's reasonable efforts included discussing with mother medical issues, assisting her in reactivating her medical assistance ... arranging for and transporting for medical appointments, including a gynecological examination, as well as an examination to address issues of high blood pressure.

The Department's reasonable efforts [have] included transportation of mother to educational meetings, appointments affecting the minor children, and assisting her in understanding what [is] occurring during those sessions, including assisting her with questioning.

The Department's efforts have included transporting mother to visits with the children. The element of transporting mother and assisting with appointments and scheduling is indicative and representative of the [c]ourt's concerns about mother's inability to access or to navigate systems that are more complex with regard to ... addressing the educational and developmental needs of each of the [children].

\*　　\*　　\*

And the [c]ourt finds that it's in the [Children's] best interest [to change] each of [their] permanency [plans to] adoption. The [c]ourt finds that it continues to be in the interest of each of the [Children] that the Department continue at a minimum to follow up on referrals to the [DDA] and [DORS]. And the [c]ourt—the context of that is that each of the children have a strong b[o]nd to their mother.

Who knows? Next month the funding could become available. I don't think it's going to happen, but (indiscernible) we're at the bottom of it all. But at the same time if there

is—we know the process. There's a long road from filing a petition for guardianship and the granting of the guardianship. We know and the [c]ourt believes that it's going to be in the best interest of these children if at all possible that there would be continued visitation—that there be a continued contact with mother.

Ms. B. timely appealed the juvenile court's decision on the grounds that the Department failed to make reasonable efforts toward reunification because Ms. B. never received any specialized parenting services. The Court of Special Appeals affirmed the lower court's finding that the Department had made reasonable efforts and held that the court did not abuse its discretion by changing the permanency plan to adoption. *See In re Shirley B.,* 191 Md.App. 678, 719, 993 A.2d 675, 699 (2010). This Court then granted Ms. B's Petition for a Writ of Certiorari.

## DISCUSSION

### A. Standard of Review

In child custody disputes, Maryland appellate courts simultaneously apply three different levels of review:

> When the appellate court scrutinizes factual findings, the clearly erroneous standard ... applies. [Secondly,] if it appears that the [juvenile court] erred as to matters of law, further proceedings in the trial court will ordinarily be required unless the error is determined to be harmless. Finally, when the appellate court views the ultimate conclusion of the [juvenile court] founded upon sound legal principles and based upon factual findings that are not clearly erroneous, the [juvenile court's] decision should be disturbed only if there has been a clear abuse of discretion.

*In re Yve S.,* 373 Md. 551, 586, 819 A.2d 1030, 1051 (2003) (emphasis and citations omitted). Accordingly, here, we apply the clearly erroneous standard when reviewing the juvenile court's factual finding that the Department made reasonable efforts to preserve and reunify the family. Furthermore, with regard to the juvenile court's ultimate decision to modify the

Children's permanency plans, we must determine whether the court abused its discretion. In doing so, we must be mindful that

> [q]uestions within the discretion of the trial court are much better decided by the trial judges than by appellate courts, and the decisions of such judges should only be disturbed where it is apparent that some serious error or abuse of discretion or autocratic action has occurred. In sum, to be reversed the decision under consideration has to be well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable.

*Id.* at 583–84, 819 A.2d at 1049. (internal quotations omitted).

## B. The Juvenile Court's Role In Establishing And Monitoring A Child's Permanency Plan

In CINA cases where a child had been removed from the family home, a juvenile court is required to periodically conduct "a permanency planning hearing to determine the permanency plan for a child[.]" Md.Code (1974, 2006 Repl.Vol., 2009 Supp.), § 3–823(b) of the Courts and Judicial Proceedings ("CJP") Article. Thereafter, the court must review the child's permanency plan "at least every 6 months until commitment is rescinded...." CJP § 3–823(h)(1)(iii). As we stated in *Yve S.,*

> The permanency plan is an integral part of the statutory scheme designed to expedite the movement of Maryland's children from foster care to a permanent living, and hopefully, family arrangement.... Services to be provided by the local social service department and commitments that must be made by the parents and children are determined by the permanency plan.

373 Md. at 581, 819 A.2d at 1048 (*quoting In re Damon M.,* 362 Md. 429, 430–31 n. 1, 765 A.2d 624, 624 n. 1 (2001)). It is the court's "responsibility [to] determin[e] the permanency plan, ... and [to] justify[ ] the placement of children in out of home placements for a specified period or on a long-term or permanent basis...." *Id.* at 577, 819 A.2d at 1046.

At the hearing, the court must consider the following factors:

(i) the child's ability to be safe and healthy in the home of the child's parent;

(ii) the child's attachment and emotional ties to the child's natural parents and siblings;

(iii) the child's emotional attachment to the child's current caregiver and the caregiver's family;

(iv) the length of time the child has resided with the current caregiver;

(v) the potential emotional, developmental, and educational harm to the child if moved from the child's current placement; and

(vi) the potential harm to the child by remaining in State custody for an excessive period of time.

Md.Code (1999, 2006 Repl.Vol., 2009 Supp.), § 5–525(f)(1) of the Family Law ("FL") Article. Moreover, at the hearing, the court shall:

(i) Determine the continuing necessity for and appropriateness of the commitment;

(ii) Determine and document in its order **whether reasonable efforts have been made to finalize the permanency plan that is in effect;**

(iii) Determine the extent of progress that has been made toward alleviating or mitigating the causes necessitating commitment;

(iv) Project a reasonable date by which a child in placement may be returned home, placed in a preadoptive home, or placed under a legal guardianship;

(v) Evaluate the safety of the child and take necessary measures to protect the child; and

(vi) **Change the permanency plan if a change in the permanency plan would be in the child's best interest.**

CJP § 3–828(h)(2) (emphasis added). *See also* FL § 5–525(e)(1) (The Department shall make "reasonable efforts . . . to preserve and reunify families[.]").

The statute, however, must be interpreted and applied in light of the constitutional rights of parents. This is because "we have recognized that parents have a fundamental, Constitutionally-based right to raise their children free from undue and unwarranted interference on the part of the State, including its courts." *In re Adoption/Guardianship of Rashawn H. and Tyrese H.*, 402 Md. 477, 495, 937 A.2d 177, 188 (2007). As Judge Wilner explained in *Rashawn*, when the fundamental rights of parents are involved,

> . . . we have not discarded the best interest of the child standard, but rather have harmonized it with that fundamental right.
>
> We have created that harmony by recognizing a substantive presumption—a presumption of law and fact—that it is in the best interest of children to remain in the care and custody of their parents. The parental right is not absolute, however. The presumption that protects it may be rebutted upon a showing either that the parent is "unfit" or that "exceptional circumstances" exist which would make continued custody with the parent detrimental to the best interest of the child.

*Id.* Thus, this Court has often recognized that, absent compelling circumstances to the contrary, the plan should be to work towards reunification as it is presumed that "it is in the best interest of the children to remain in the care and custody of their [biological] parent[ ]." *Id.* at 495, 937 A.2d at 188. Nevertheless, that course must be "consistent with the best interests of the child[.]" CJP § 3–823(e)(1)(i). In other words, "where the fundamental right of parents to raise their children stands in the starkest contrast to the State's effort to protect those children from unacceptable neglect or abuse, the best interest of the child remains the ultimate governing standard." *Rashawn*, 402 Md. at 495, 937 A.2d at 188.

Additionally, where, as here, there is a proven history of abuse or neglect, "the proper issue before the hearing judge [is] whether there was sufficient evidence that further abuse or neglect [is] unlikely." *Yve S.*, 373 Md. at 593,

819 A.2d at 1055. *See also* FL § 9–101(b) ("Unless the court specifically finds that there is no likelihood of further child abuse or neglect by [the parent], the court shall deny custody or visitation rights to that party[.]"). The burden of proof rests upon the parent to show that the past neglect or abuse will not be repeated. *See Yve S.,* 373 Md. at 587, 819 A.2d at 1052 ("The burden is on the parent previously having been found to have abused or neglected his or her child to adduce evidence and persuade the court to make the requisite finding under [Section] 9–101(b)."). Yet, "even upon substantial evidence of past abuse or neglect, [Section 9–101] does not require a finding that future abuse or neglect is impossible or will, in fact, never occur, but only that there is no likelihood— no probability—of its recurrence." *In re Adoption No. 12612,* 353 Md. 209, 238, 725 A.2d 1037, 1051 (1999).

### C. The Extent of "Reasonable Efforts"

■ The thrust of Ms. B.'s argument is that the Department does not satisfy its "reasonable efforts" requirement if it merely refers a parent to services necessary for reunification, when that parent, "through no fault of her own[,] cannot avail herself of those services[.]" The Department and counsel for Shirley counter, arguing that the reasonableness of the Department's efforts must be considered in light of the limitations on its and other related governmental resources.

The Court of Special Appeals opinion in *In re James G.,* 178 Md.App. 543, 943 A.2d 53 (2008), tracked, in great detail, the evolution of the "reasonable efforts" requirement. As Judge Hollander explained, the " 'reasonable efforts' requirement . . . has its genesis in federal law, with the enactment of the Adoption Assistance and Child Welfare Act of 1980 ("AACWA")[.]" *Id.* at 572, 943 A.2d at 69. The AACWA "was designed with a focus on family preservation and reunification. [It] sought to end the stagnation [of] keeping children in foster homes by requiring states to make reasonable efforts to reunite families." *Id.* at 573, 943 A.2d at 70 (*quoting* Kathleen S. Bean, *Reasonable Efforts: What State Courts Think,* 36 U. Tol. L.Rev. 321, 325 (2005)). Under the

AACWA, "reasonable efforts quite simply had to do with the quality of preservation services given before foster care placement and the quality of reunification services provided during foster care placement." Will L. Crossley, *Defining Reasonable Efforts: Demystifying the State's Burden under Federal Child Protection Legislation,* 12 B.U. Pub. Int. L.J. 259, 272 (2003).

Although the AACWA initially fulfilled its goal of decreasing the number of children left to languish in "foster care drift," the reverse began to occur in the late 1980s. *See* Bean, 36 U. Tol. L.Rev. at 325–26. Many believed the "reasonable efforts" requirement was to blame. *Id.* at 326. The criticism included

> charges that children were still in foster homes too long. The charge was that they lingered now, not because of agency inaction, but because agencies were engaged in excessive efforts to repair hopelessly dysfunctional families. Instead of the permanency intended by the federal reasonable efforts clause, impermanency resulted. Perhaps of even greater concern, however, was the perception that children were being reunited with parents when it was not safe to do so in the name of reasonable efforts.

*Id.* (internal quotations omitted). In response, Congress amended the AACWA by enacting the Adoption and Safe Families Act ("ASFA") in 1997. *See* Bean, 36 U. Tol. L.Rev. at 325–26. While it did not eliminate the "reasonable efforts" mandate, Congress did narrow it by making the health and safety of the child the "paramount" consideration when "determining reasonable efforts to be made ... and in making such reasonable efforts." *Id.*

Despite the problematic history of the "reasonable efforts" mandate, the term itself remains undefined under federal law. *See James G.,* 178 Md.App. at 578, 943 A.2d at 73. In its Notice of Proposed Rulemaking with regard to ASFA, the United States Department of Health and Human Services provided the following explanation for its rejection of a clear definition:

During our consultation with the field, some recommended that we define reasonable efforts in implementing the ASFA. We do not intend to define "reasonable efforts." To do so would be a direct contradiction of the intent of the law. **The statute requires that reasonable efforts determinations be made on a case-by-case basis.** We think any regulatory definition would either limit the courts' ability to make determinations on a case-by-case basis or be so broad as to be ineffective. **In the absence of a definition, courts may entertain actions such as the following in determining whether reasonable efforts were made:**

\* \* \*

● Was the service plan customized to the individual needs of the family or was it a standard package of services?

● Did the agency provide services to ameliorate factors present in the child or parent, i.e., physical, emotional, or psychological, that would inhibit a parent's ability to maintain the child safely at home?

● **Do limitations exist with respect to service availability,** including transportation issues? If so, what efforts did the agency undertake to overcome these obstacles?

\* \* \*

. . . Typically, State child welfare agencies and the courts encounter cases in which it is appropriate to make reasonable efforts to prevent a child's removal from home or to reunify the family. Quite frequently, though, States are faced with circumstances in which it is unclear how much effort is reasonable. At the initial stage of and throughout its involvement with a family, the child welfare agency assesses the family's needs and circumstances. The State agency should make reasonable efforts to prevent the child's removal from home or to reunify the family commensurate with the assessment.

63 F.R. 50058, 50073 (1998) (emphasis added).

The relevant Maryland statutes contain language "nearly identical to the reasonable efforts provision of ASFA, [and the General Assembly has] done little else legislatively to define

reasonable efforts." Crossley, 12 B.U. Pub. Int'l L.J. at 295. Thus, it is not surprising that the Court of Special Appeals considered Maryland's definition of "reasonable efforts" to be "amorphous[,]" without any "bright line rule to apply to the 'reasonable efforts' determination[, meaning that] each case must be decided based on its unique circumstances." *Shirley,* 191 Md.App. at 710–11, 993 A.2d at 694. The Courts & Judicial Proceedings Article defines "reasonable efforts" as "efforts that are reasonably likely to achieve the objectives set forth in § 3–801(b)(1) and (2) of this subtitle." CJP § 3–801(v). The objective pertinent to this case would be to "finalize the permanency plan in effect for the child[ ] and meet the needs of the child, including the child's health, education, safety, and preparation for independence]." CJP § 3–816.1(b)(2).

▬ Even though "reasonable efforts" must be determined on a case-by-case basis, this Court has provided guideposts for future cases. In the seminal case, *Rashawn,* we explained that

> poverty, of itself, can never justify the termination of parental rights. . . . Nor will homelessness, alone, or physical, mental or emotional disability, alone, justify such termination. . . . [W]hat the statute appropriately looks to is whether the parent is, or within a reasonable time will be, able to care for the child in a way that does not endanger the child's welfare. [The court's] primary consideration must be given to "the safety and health of the child."

*Rashawn,* 402 Md. at 499–500, 937 A.2d at 190–91. In this vein, we directed the Department to actively pursue services aimed at reunification:

> The statute does not permit the State to leave parents in need adrift and then take away their children. The court is required to consider the timeliness, nature, and extent of the services offered by DSS or other support agencies . . . and whether additional services would be likely to bring about a sufficient and lasting parental adjustment that would allow the child to be returned to the parent. Implicit

in that requirement is that a reasonable level of those services, designed to address both the root causes and the effect of the problem, must be offered[.]

*Id.* at 500, 937 A.2d at 191. Yet, we also recognized that there are limits to what the Department is required to do:

**The State is not obliged to find employment for the parent, to find and pay for permanent and suitable housing for the family, to bring the parent out of poverty, or to cure or ameliorate any disability that prevents the parent from being able to care for the child.** It must provide reasonable assistance in helping the parent to achieve those goals, but its duty to protect the health and safety of the children is not lessened and cannot be cast aside if the parent, despite that assistance, remains unable or unwilling to provide appropriate care.

**The State is not required to allow children to live . . . in temporary shelters . . . or to grow up in permanent chaos and instability, bouncing from one foster home to another until they reach eighteen and are pushed onto the streets as adults, because their parents, even with reasonable assistance from DSS, continue to exhibit an inability or unwillingness to provide minimally acceptable shelter, sustenance, and support for them.**

*Id.* at 500–01, 937 A.2d at 191 (emphasis added).

 Here, perhaps more so than any of our previous CINA cases, the record demonstrates that economic considerations have shaped the boundaries of the Department's reasonable efforts. As the juvenile court recognized, the Department was "at the mercy of agencies that lack[ed] necessary funding to provide services" that the court deemed potentially helpful to Ms. B. In situations such as this, "the State's ability to provide adequate services is constrained by its staff and dollar limitations[;] therefore, the State must put forth reasonable efforts **given its available staff and financial resources** to maintain the legal bond between parent and child." *In re Jonathan T.,* 148 N.H. 296, 808 A.2d 82, 88 (2002) (emphasis added) (citation omitted). *See also* COMAR 07.02.11.14(A)

(2011) (The Department shall provide, "[t]o **the extent that funds and other resources are available,** a range of services that will facilitate or maintain successful reunification of the child[.]") (emphasis added). Accordingly, "reunification efforts must be judged within the context of the resources available to the agency, with the agency receiving the benefit of the doubt when resources are limited." Bean, 36 U. Tol. L.Rev. at 365. *See also In re Giorgianna H.*, 205 S.W.3d 508, 519 (Tenn.App. 2006) ("The factors that courts use to determine the reasonableness of the Department's efforts include . . . the resources available to the Department[.]"). In short, a juvenile court must be cognizant of the availability of services when determining whether the Department's efforts have been reasonable. *See In the Interest of C.S.*, 516 N.W.2d 851, 858 (Iowa 1994) ("To allow the juvenile court to order placements without regard for funding limitations would circumvent the appropriations process of the legislature and the budgetary process of the Department."). Indeed, the U.S. Department of Health and Human Services instructs courts to consider whether "limitations exist with respect to service availability" when examining reasonableness. 63 F.R. 50073.

To be sure, the Department must make a good faith attempt at connecting a parent with services necessary for reunification. In *In re Adoption/Guardianship Nos. J9610436 & J9711031*, 368 Md. 666, 682, 796 A.2d 778, 787 (2002) ("*Case 36* "), we reversed a juvenile court's order terminating the parental rights of a mentally-disabled father because the Department could not show that it had "offered any specialized services designed to be particularly helpful to a parent" with such cognitive limitations. For example, the Department failed to utilize services from the Arc and the DDA, "even though it was relying in its drive toward termination on the fact that in the opinion of its [social] workers, petitioner was disabled by reason of mental impairment." [8] *Id.* at 682–83,

---

**8.** For example, the Department did not "even offer petitioner services to assist him with literacy," even though its expert psychiatrist noted that the petitioner could not complete standard tests to measure intelli-

796 A.2d at 787–88. This was particularly unsettling because the "services [were readily] available" and the father had proven to be willing and eager to work toward reunification. *Id.* at 682, 700, 796 A.2d at 787, 798. In sharp contrast, as we detail later, those services were not available here, despite extensive efforts by the Department to obtain them.

Similarly, in *James G.*, the juvenile court erred by changing a child's permanency plan from reunification to relative placement when the Department made only a single referral in an effort to combat the parental obstacles to reunification. *James*, 178 Md.App. at 599, 943 A.2d at 85. A Department case worker had testified that the only impediments to reuniting father with son was the father's lack of stable employment and lack of housing, and the Department claimed that it could not provide housing assistance until the father was employed. *Id.* Yet, "the only effort the Department made to address [the father's] unemployment was a single referral to an organization that could not address [the father's] employment needs." *Id.* The juvenile court concluded that "[c]ertainly, more could have been done to help [the father] get a job, which would in turn have helped with getting housing[,]" but it agreed with the Department that a change in the permanency plan was both "practicable and realistic." *Id.* at 564, 943 A.2d at 65. The Court of Special Appeals, on the other hand, considered the Department's efforts to be "shameful and unacceptable" because the fruitlessness of this one referral created a domino effect that led to the decision not to reunify parent and child. *Id.* at 601, 943 A.2d at 86. It held that the Department had not made "reasonable efforts" toward reunification and, accordingly, reversed the juvenile court's order changing the son's permanency plan. *Id.* at 606, 943 A.2d at 89.

---

gence because of his "inability to read well." *In re Adoption/Guardianship Nos. J9610436 & J9711031*, 368 Md. 666, 682, 796 A.2d 778, 787 (2002) (*"Case 36"*). Despite this oversight, however, the father "enrolled, voluntarily and without prompting from [the Department], in remedial reading classes to improve his reading ability." *Id.* at 688, 796 A.2d at 790.

An examination of these two cases provides some glaring distinctions from the one at hand. First, in both *Case* 36 and *James* there was no history of child abuse or willful neglect, *see Case 36,* 368 Md. at 688, 796 A.2d at 791 and *James,* 178 Md.App. at 565, 943 A.2d at 65. Here, there are well-documented instances of physical and sexual abuse, as well as extreme neglect. Moreover, the number of services readily available to the Department here was severely limited by a general dearth of financial resources. This is in contrast with the circumstances in *Case 36,* where we held that the Department "had at its disposition better suited services for petitioner" than those which it had offered, 368 Md. at 701, 796 A.2d at 798, and in *James,* where the juvenile court found that Department could have done more, 178 Md.App. at 564, 943 A.2d at 65.

Here, the juvenile court understood that the Department was in a bind when it came to providing appropriate services for Ms. B., and that it was inappropriate for the court to "order the Department to finance services that are within the purview of other agencies[.]" Despite these financial obstacles, however, the Department's efforts to reunify Ms. B. with her children, including its assistance with her daily living, were legion. As enumerated in the court's Order of Commitment, these efforts included:

a. referring Mother to the DDA and DORS;

b. assisting in Mother's preparation of the application for services and its submissions and achieving placement of Mother on a waiting list (second tier);

c. attempting to determine when Mother might be able to receive services (however, efforts did not meet with success in determining when the services might be available);

d. determining when Mother might be able to be placed with Melwood, only to find that, although an assessment was done, Melwood has lost the assessment and Melwood is no longer accepting clients of DORS;

e. contacting the Community Connections Agency to determine if other funds were available for the services that

were not readily accessible through DDA and DORS and funds that might have been available after the December review in this case had been exhausted by January, 2009;

f. funding and obtaining a necessary neuropsychological evaluation of Mother in an effort to provide an evaluation that would have been provided by other sources;

g. obtaining a family clinical interview with regard to [Shirley] and her siblings;

h. discussing with Mother her medical issues;

i. assisting Mother in reactivating her medical assistance;

j. arranging for and transporting Mother for medical appointments, including a gynecological examination, as well as an examination to address issues of high blood pressure;

k. transporting Mother to educational meeting and appointments affecting [Shirley] and assisting Mother in understanding what was occurring and assisting her in questioning;

l. transporting Mother to visits with [Shirley] and her siblings;

m. providing for management of [Shirley's] medication;

n. attending meetings concerning and following the progress of [Shirley's] Individualized Education Program; [and]

o. providing necessary therapy and referring [Shirley] to Pathfinders for specialized therapy to help her work through trauma issues[.]

██ This is an extensive list, and it is clear that the Department did not sit on its hands and wait for the necessary services to materialize. Indeed, the crux of Ms. B.'s argument is not that the Department, itself, could have done more, but that she was unable to avail herself of the requisite services through no fault of her own. She attempts to analogize this situation to the revocation of probation where the failure to comply was not the fault of the probationer. This Court has held that "ordinarily probation may not be revoked if the probationer proves that his failure to comply was not willful but rather resulted from factors beyond his control and

through no fault of his own." *Bailey v. State,* 327 Md. 689, 695, 612 A.2d 288, 291 (1992) (emphasis omitted). Yet, as the Department correctly explains, the purpose of a CINA case is to protect the child, not to punish the parent.

Certainly, Ms. B.'s situation is a tragic one, with which we sympathize, but our sentiment cannot distract us from the relevant statutory criteria. *See* FL § 5–525(f) ("In developing a permanency plan for a child . . ., the local department shall give primary consideration to the best interests of the child[.]"). In this instance, we must "balance" Ms. B.'s right to raise her children against the State's right "to protect children, who cannot protect themselves, from abuse and neglect." *Rashawn,* 402 Md. at 497, 937 A.2d at 189. As Shirley described, Ms. B. repeatedly invited the violence that wreaked havoc on their lives back into her home, in the form of Mr. T.: "[O]ur dad . . . hurt our mom really bad . . . but then our mom would let him come back again and hurt us all over again . . . including her." Even the Department's removal of the Children from her care did not prevent Ms. B. from continuously placing them in harm's way, as Gimperling later discovered when Mr. T. informed her that, during the Children's home visits, he had been living with the Ms. B "the whole time."

Here, we must be particularly cautious not to presumptively favor reunification because of the severe neglect and emotional trauma suffered by the Children in Ms. B.'s home. *See In re Yve S.,* 373 Md. at 570, 819 A.2d at 1041 (*quoting In re Mark M.,* 365 Md. 687, 705–06, 782 A.2d 332, 342–43 (2001)) ("That which will best promote the child's welfare becomes particularly consequential where the interests of a child are in jeopardy, as is often the case in situations involving sexual, physical, or emotional abuse by a parent."); *see also* FL § 9–101(b) ("Unless the court specifically finds that there is no likelihood of further child abuse or neglect by [the parent], the court shall deny custody or visitation rights to that party[.]").

We agree with the juvenile court that the Department's efforts were diligent and made in good faith. As the CSA

observed, the Department did not throw up its hands in defeat when presented with multiple monetary barriers:

> [The Department] referred Ms. B. to parenting classes with the Family Tree. It arranged, and paid for, individual mental health therapy at Community Counseling and Mentoring, with therapist Debbie Austin, to address Ms. B.'s mental health needs and parenting skills. The Department then sought more specific services for Ms. B. due to her cognitive limitations, including referring Ms. B. to DORS, Melwood, and DDA, and helping Ms. B. complete an application for services. When Ms. B. was placed on a waiting list for DDA because adequate funding was not available, the Department attempted, albeit without success, to locate an alternative source of funds through the Community Connections Agency. It provided Ms. B. with information about ARC, which offered a support group for parents with developmental disabilities. Additionally, the Department paid for an individual neuropsychological evaluation for Ms. B. It cannot be said here ... that the Department did not seek specialized services to assist Ms. B.

*Shirley,* 191 Md.App. at 715–16, 993 A.2d at 697. We do not see how the Department could have acted any differently to attempt to address Ms. B.'s needs, and counsel for Ms. B. does not enlighten us.[9] As discussed earlier, many authorities, including the U.S. Department of Health and Human Services, direct courts to consider the "reasonableness" of the Department's efforts in light of the availability of services. Here, services were withheld from Ms. B. due to forces outside the

---

9. Ms. B. does mention that the Department did not contact the Kennedy Krieger Institute to see if they had services available for her. Kennedy Krieger is an institution "dedicated to improving the lives of children and adolescents with pediatric developmental disabilities through patient care, special education, research, and professional training." Kennedy Krieger Institute: Introduction, http://www.kennedykrieger. org/kki_2nd_insidesp?pid=1 (last visited March 28, 2010). Disregarding the obvious—that Ms. B. is not a child or an adolescent—Ms. B. does not explain how the Department, which could not fund the necessary services at Melwood, would be able to pay for her services at Kennedy Krieger.

Department's control, but not for its lack of trying. Thus, we agree with the CSA that the Department made reasonable efforts to reunify Ms. B. with her children, and we hold that the juvenile court's finding was not clearly erroneous.

**D. The Decision To Change The Children's Permanency Plans**

Ms. B. also challenges the juvenile court's ultimate decision to change the Children's permanency plans from reunification to adoption. We have already discredited her primary contention that "the trial court necessarily abused its discretion" in making the threshold determination that the Department had made reasonable efforts towards reunification. Moreover, the record makes clear that, while in Ms. B.'s care, the Children had been exposed to physical and sexual violence and neglect, and Ms. B. does not present any evidence that such conduct would be unlikely to continue.[10] *See* FL § 9–101(b) ("Unless the court specifically finds that there is no likelihood of further child abuse or neglect by [the parent], the court shall deny custody or visitation rights to that party[.]"). Indeed, there was some testimony that Ms. B. continued to allow unsupervised contact between Mr. T. and Shirley, a dangerous gamble in direct violation of an earlier court order. Finally, Ms. B.'s inability to improve her situation, arguably through no fault of her own, left the Children "languishing in foster care drift" for 28 months, with no end in sight. *Cf. Rashawn H.*, 402 Md. at 500, 937 A.2d at 192. ("The State is not required to allow children to . . . grow up in permanent chaos and instability, bouncing from one foster home to another . . . because their parents, even with reasonable assistance from [the Department], continue to exhibit an inability . . . to provide minimally acceptable shelter, sustenance, and support for them."). While we acknowledge that Ms. B. had been largely cooperative with the Department, we must balance her interests with the Children's health and

---

**10.** It appears that the juvenile court was not aware of the extent of the abuse until it was presented with Dr. Lewis's report at the 2009 hearing; thus, the court's change in attitude is understandable.

safety. *See* FL § 5–525(f)(1) (listing "the child's ability to be safe and healthy in the home of the child's parent" as an integral factor in determining the permanency plan). Thus, from the sum of these factors, we see no abuse of discretion in the juvenile court's decision to change the Children's permanency plans from reunification to adoption.

We hasten to note that placing a child in an adoptive home does not necessarily sever all ties between child and biological parent. "Open adoption" is an "adoption in which it is the explicit intent of all parties to the adoption that the child maintain contact, including the possibility of visitation, with the birth parents[.]" COMAR 07.02.12.02(B)(29) (2011). The Department is directed to explore "open adoption" when "[o]lder children who are placed in out-of-home care know who their birth parents are and have already formed significant emotional attachments to them; and ... [i]t is otherwise appropriate and in the child's best interest not to sever all ties with the child's birth parents[.]" COMAR 07.02.12.12–1(A) (2011). *See also* COMAR 07.05.03.19(A)(2) (2011) ("A child may be considered for open adoption when ... [t]he child's age and level of contact with, or commitment to, the parent make it emotionally difficult for the child to sever all ties with the parent[.]"). Indeed, here, the juvenile court found that "it's going to be in the best interest of these children if at all possible that there would be continued visitation—that there be a continued contact with mother." Accordingly, the court ordered that the standing visitation orders permitting contact between Ms. B. and her children remain unchanged.

## CONCLUSION

The reasonableness of the Department's efforts to reunify parent with child cannot be considered in a vacuum, but rather, must be evaluated against the backdrop of the services available to it. Here, the Department actively tried to connect the mother with services that could potentially assist her in her parental role, only to be thwarted by forces outside its control. Accordingly, it made reasonable efforts toward reunification. Ultimately, as the Children could not be safely

returned to the mother anytime within the foreseeable future, the juvenile court did not err in changing the Children's permanency plans from reunification to adoption.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AND THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AFFIRMED. COSTS TO BE PAID BY PETITIONER.**

Judge HARRELL joins in the judgment only.

